IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KAIL MARIE, et al.,

       Plaintiffs,

v.

ROBERT MOSER, M.D., in his official
capacity as Secretary of the Kansas
Department of Health and Environment,
et al.,

       Defendants.

Case No. 14-cv-02518-DDC/TJJ

## MEMORANDUM AND ORDER

Plaintiffs in this lawsuit seek injunctive and declaratory relief under 42 U.S.C. § 1983. Specifically, they ask the Court to declare unconstitutional and enjoin defendants from enforcing certain provisions of Kansas law that prohibit plaintiffs and other same-sex couples from marrying.[1]  Plaintiffs also ask the Court to order defendants (and their officers, employees, and agents) to issue marriage licenses to same-sex couples on the same terms they apply to couples consisting of a man and a woman, and to recognize marriages validly entered into by plaintiffs.

The case, now pending on plaintiffs' motion for a preliminary injunction (Doc. 3), requires the Court to decide whether Kansas' laws banning same-sex marriages violate the Constitution of the United States.  Judging the constitutionality of democratically enacted laws is among "the gravest and most delicate" enterprises a federal court ever undertakes.[2]  But just as

---

[1] Plaintiffs' Complaint targets Article 15, § 16 of the Kansas Constitution, K.S.A. §§ 23-2501 and 23-2508 and "any other Kansas statute, law, policy or practice."

[2] *Blodgett v. Holden*, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring).

1

surely, following precedent is a core component of the rule of law.  When the Supreme Court or the Tenth Circuit has established a clear rule of law, our Court must follow it.[3]

Defendants have argued that a 1972 Supreme Court decision controls the outcome here. The Tenth Circuit has considered this proposition and squarely rejected it.[4]  Consequently, this Order applies the following rule, adopted by the Tenth Circuit in *Kitchen v. Herbert*, to the Kansas facts:

> We hold that the Fourteenth Amendment [to the United States Constitution] protects the fundamental right to marry, establish a family, raise children, and enjoy the full protection of a state's marital laws.  A state may not deny the issuance of a marriage license to two persons, or refuse to recognize their marriage, based solely upon the sex of the persons in the marriage union.[5]

Because Kansas' constitution and statutes indeed do what *Kitchen* forbids, the Court concludes that Kansas' same-sex marriage ban violates the Fourteenth Amendment to the Constitution. Accordingly, the Court grants plaintiffs' request for preliminary relief and enters the injunction described at the end of this Order.  The following discussion explains the rationale for the Court's decision and addresses the litany of defenses asserted by defendants.

## Background

Plaintiffs are two same-sex couples who wish to marry in the state of Kansas.

Defendants are the Secretary of the Kansas Department of Health and Environment and the

---

[3] *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (quoted in *Kitchen v. Herbert*, 755 F.3d 1193, 1232 (10th Cir. 2014) (Kelly, J., dissenting)); *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) (when no Supreme Court decision establishes controlling precedent, a district court "must follow the precedent of [its] circuit, regardless of its views [about] the advantages of" precedent from elsewhere).

[4] *Kitchen*, 755 F.3d at 1208 (rejecting argument that *Baker v. Nelson*, 409 U.S. 810 (1972) controls challenges to the constitutionality of bans against same-sex marriage), *cert. denied*, No. 14-124, 2014 WL 3841263 (U.S. Oct. 6, 2014).

[5] *Id.* at 1199.

Clerks of the Sedgwick and Douglas County District Courts.  Plaintiffs' affidavits establish the facts stated below.  Defendants never contest the factual accuracy of the affidavits, so the Court accepts them as true for the purpose of the current motion.  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (a court deems uncontested facts established by affidavit as admitted for purpose of deciding a motion for preliminary injunction) (citations and subsequent history omitted).

### A.  Plaintiffs

#### 1.  Kail Marie and Michelle Brown

Plaintiffs Kail Marie and Michelle Brown live together in Lecompton, Kansas, which is located in Douglas County.  Ms. Marie and Ms. Brown assert they have lived in a committed relationship for twenty years.  Except that they both are women, Ms. Marie and Ms. Brown meet all other qualifications for marriage in the state of Kansas.  On October 8, 2012, Ms. Marie appeared at the office of the Clerk of the Douglas County District Court to apply for a marriage license so that she and Ms. Brown could marry.  The deputy clerk, working under the supervision of Clerk Hamilton, asked for Ms. Marie and Ms. Brown's personal information and identification, and wrote down their information on an application form.  The deputy clerk then gave the form to Ms. Marie and instructed her to return it no sooner than Monday, October 13, after Kansas' statutory three-day waiting period for issuing a marriage license had expired.

The next day, Chief Judge Robert Fairchild of the Seventh Judicial District, which consists of Douglas County, issued Administrative Order 14-13.  In pertinent part, it states:

> The court performs an administrative function when it issues a marriage license. . . . The Court's role in administrative matters is to apply and follow the existing laws of the State of Kansas.  Recently, the United States Supreme Court declined to review several cases in which the Circuit Courts held that similar provisions contained in the constitutions of other states violate the United States Constitution.  Included in these cases were two cases from the Tenth Circuit Court

> of Appeals.  While Kansas is [] within the jurisdiction of the Tenth Circuit, none of these cases involved Article 15, §16 of the Kansas Constitution.  This court may not make a determination as to the validity of this constitutional provision without a judiciable case before it concerning the court's issuance of or failure to issue a marriage license.

Seventh Judicial District Administrative Order 14-13 (Doc. 23-7 at 3-4).  Plaintiffs never say whether Ms. Marie submitted the marriage application or whether the clerk actually denied it, but Judge Fairchild's order makes it clear:  the clerk would have denied Ms. Marie's application.

### 2.  Kerry Wilks and Donna DiTrani

Plaintiffs Kerry Wilks and Donna DiTrani assert they have lived in a committed relationship for five years.  The two reside together in Wichita, Kansas, in Sedgwick County.  Except that they both are women, Ms. Wilks and Ms. DiTrani meet all other qualifications for marriage in the state of Kansas.  On October 6, 2014, Ms. Wilks and Ms. DiTrani appeared in person at the office of the Clerk of the Sedgwick County District Court to apply for a marriage license.  A deputy clerk and the clerk's supervisor—both working under the supervision of Clerk Lumbreras—refused to give plaintiffs an application for a marriage license because they sought to enter a same-sex marriage.  Plaintiffs returned to the office of the Clerk of the Sedgwick County District Court on October 7 and October 8.  Each time, a deputy clerk refused to give Ms. Wilks and Ms. DiTrani an application for a marriage license.

On October 9, 2014, Ms. Wilks and Ms. DiTrani again returned to the office of the Clerk of the Sedgwick County District Court to apply for a marriage license.  This time, a deputy clerk asked them for pertinent information and wrote it down on a marriage application form, which the two signed under oath.  After Ms. Wilks and Ms. DiTrani completed and submitted the marriage license application form, the deputy clerk—reading from a prepared statement—informed them that their application was denied.  The deputy clerk announced that same-sex

marriage violates provisions of the Kansas Constitution, and that the Sedgwick County District Court would not issue marriage licenses to same-sex couples "until the Supreme Court otherwise rules differently."

### B. Defendants

#### 1. Robert Moser, M.D.

Defendant Robert Moser is the Secretary of the Kansas Department of Health and Environment.  Secretary Moser is responsible for directing Kansas' system of vital records, and supervising and controlling the activities of personnel who operate the system of vital records. As part of his duties, Secretary Moser furnishes forms for marriage licenses, marriage certificates, marriage license worksheets and applications for marriage licenses used throughout Kansas; maintains a publicly available vital records index of marriages; and publishes aggregate data on the number of marriages occurring in the state of Kansas.  Secretary Moser is also responsible for ensuring that all of these functions comply with Kansas law, including those that prohibit same-sex couples from marrying.  Plaintiffs believe that Secretary Moser's responsibilities include furnishing forms that exclude same-sex couples from marriage by requiring applicants to designate a "bride" and a "groom."  Plaintiffs name Secretary Moser in his official capacity, and allege that he acted under color of state law at all relevant times.

#### 2. Douglas Hamilton

Defendant Douglas Hamilton is the Clerk of the District Court for Kansas' Seventh Judicial District (Douglas County).  Mr. Hamilton's responsibilities as Clerk of the Court include:  issuing marriage licenses; requiring couples who contemplate marriage to swear under oath to information required for marriage records; collecting a tax on each marriage license; authorizing qualified ministers to perform marriage rites; filing, indexing and preserving

marriage licenses after the officiants return them to the court; forwarding records of each marriage to the Kansas Department of Health and Environment; and correcting and updating marriage records.  Mr. Hamilton must ensure that he performs each of these functions in compliance with all applicable Kansas laws, including the prohibition against same-sex marriage.  Plaintiffs name Mr. Hamilton in his official capacity, and allege that he acted under color of state law at all times relevant to this suit.

### 3.   Bernie Lumbreras

Defendant Bernie Lumbreras is the Clerk of the District Court for Kansas' Eighteenth Judicial District (Sedgwick County).  Ms. Lumbreras holds the same position in Sedgwick County as Mr. Hamilton holds in Douglas County, and is responsible for administering the same marriage-related functions.  When she performs these functions, Ms. Lumbreras also must ensure that each of these functions complies with Kansas law, including the same-sex marriage ban. Plaintiffs allege that the deputy clerk who denied Ms. Wilks and Ms. DiTrani's marriage license application worked under the direction and supervision of Ms. Lumbreras.  Plaintiffs name Ms. Lumbreras in her official capacity, and allege that she acted under color of state law at all times relevant to this suit.

## C.  Challenged Laws

Plaintiffs contend the Court should declare the state laws banning same-sex marriages in Kansas invalid under the Fourteenth Amendment to the United States Constitution.  Plaintiffs specifically challenge Article 15, § 16 of the Kansas Constitution and K.S.A. §§ 23-2501 and 23-2508, but also seek to enjoin "any other Kansas statute, law, policy, or practice that excludes [p]laintiffs and other same-sex couples from marriage."  Doc. 4 at 1.  Article 15, § 16 of the Kansas Constitution provides:

> (a) The marriage contract is to be considered in law as a civil contract.  Marriage shall be constituted by one man and one woman only.  All other marriages are declared to be contrary to the public policy of this state and are void.

> (b)  No relationship, other than a marriage, shall be recognized by the state as entitling the parties to the rights or incidents of marriage.

K.S.A. § 23-2501 codifies Kansas' same-sex marriage prohibition as part of the state's statutes, providing:

> The marriage contract is to be considered in law as a civil contract between two parties who are of opposite sex.  All other marriages are declared to be contrary to the public policy of this state and are void.  The consent of the parties is essential.  The marriage ceremony may be regarded either as a civil ceremony or as a religious sacrament, but the marriage relation shall only be entered into, maintained or abrogated as provided by law.

By their plain terms, Article 15, § 16 of the Kansas Constitution and K.S.A. § 23-2501 prohibit same-sex couples from marrying.  But K.S.A. § 23-2501 also declares all "other [non-opposite sex] marriages . . . contrary to the public policy of this state and . . . void."  K.S.A. § 23-2508 extends this rule to same-sex marriages performed under the laws of another state:

> All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, shall be valid in all courts and places in this state.  It is the strong public policy of this state only to recognize as valid marriages from other states that are between a man and a woman.

When read together, K.S.A. §§ 23-2501 and 23-2508 dictate a choice-of-law rule that prevents Kansas from recognizing any same-sex marriages entered in other states, even if the marriage is otherwise valid under the laws of the state where it was performed.  Thus, Kansas law both prohibits same-sex couples from marrying and refuses to recognize same-sex marriages performed consistent with the laws of other states.  Plaintiffs' Complaint challenges both features of Kansas' marriage laws.

## Analysis

### I.   Jurisdiction and Justiciability

Before a federal court can reach the merits of any case, it must determine whether it has jurisdiction to hear the case.  Here, this exercise consists of two related parts.  First, does the Court have subject matter jurisdiction to decide the claims presented in the Complaint?  Title 28 U.S.C. § 1331, among other statutes, answers this question by conferring jurisdiction on federal courts to decide questions arising under the Constitution of the United States.  Plaintiffs' claims here easily fall within this statute's grant of jurisdiction.  This leads to the second piece of the analysis:  Do plaintiffs have standing to pursue the claims they assert in their Complaint?

### A.  Standing

"Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies."  *Chamber of Commerce of United States v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010).  Standing is an indispensable component of the Court's jurisdiction and plaintiffs bear the burden to show the existence of an actual Article III case or controversy.  *Id.* at 756. The Court must consider standing issues sua sponte to ensure the existence of an Article III case or controversy.  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009).

To establish Article III standing, a plaintiff must show that (1) he or she has "suffered an injury in fact;" (2) the injury is "fairly traceable to the challenged action of the defendant;" and, (3) it is likely that the injury "will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted).  Plaintiffs who sue public officials can satisfy the causation and redressability requirements—parts (2) and (3) of this standard—by demonstrating "a meaningful nexus" between the defendant and the asserted injury.  *Bronson v. Swensen*, 500 F.3d 1099, 1111-12 (10th Cir. 2007).

8

Plaintiffs' facts, ones defendants do not challenge, assert that Kansas' laws banning same-sex marriage prevented the two court clerks from issuing marriage licenses to them. These undisputed facts satisfy all three parts of *Lujan*'s test.

As it pertains to Clerks Lumbreras and Hamilton, these facts, first, establish that plaintiffs suffered an actual ("in fact") injury when the Clerks, acting on account of state law, refused to issue marriage licenses to plaintiffs. Second, this injury is "fairly traceable" to Kansas' laws. Chief Judge Fairchild's Administrative Order 14-13 explains why the license did not issue to plaintiffs Marie and Brown. Likewise, the prepared statement read by the Sedgwick County deputy clerk reveals that Kansas' ban was the only reason the clerk refused to issue a license to plaintiffs Wilks and DiTrani. And last, common logic establishes that the relief sought by plaintiffs, if granted, would redress plaintiffs' injuries. The Clerks refused to issue licenses because of Kansas' same-sex marriage ban. It stands to reason that enjoining enforcement of this ban would redress plaintiffs' injuries by removing the barrier to issuance of licenses.

The standing analysis of the claim against Secretary Moser is more muted. The Complaint asserts that Secretary Moser, in his official duties, ensures compliance with Kansas marriage laws, including the ban against same-sex marriage, and issues forms that district court clerks and other governmental officials use to record lawful, valid marriages. Plaintiffs also allege that Secretary Moser controls the forms that governmental workers distribute to marriage license applicants. This includes, plaintiffs assert, a form requiring license applicants to identify one applicant as the "bride" and the other as the "groom." Secretary Moser's response to plaintiffs' motion papers never disputes these facts and the Court concludes they satisfy *Lujan*'s three-part standing test. That is, they establish a prima facie case that Secretary Moser has

caused at least some aspect of plaintiffs' injury, that at least part of their injury is traceable to the Secretary, and the relief requested would redress some aspect of plaintiffs' injury.[6]

Defendants argue that no standing can exist because they lack the wherewithal to force other state officials to recognize plaintiffs' same-sex marriages, even if licenses are issued. This argument misses the point. *Lujan*'s formulation does not require a plaintiff to show that granting the requested relief will redress every aspect of his or her injury. In equal protection cases, a plaintiff must show only that a favorable ruling would remove a barrier imposing unequal treatment. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.") (citing *Turner v. Fouche*, 396 U.S. 346, 362 (1970)). Plaintiffs here have made a prima facie showing that the relief they seek would redress aspects of their licensing claims. This is sufficient to satisfy Article III's standing requirement.

Secretary Moser raises a similar redressability issue, arguing that executive branch officials are not proper defendants because employees of the Kansas judiciary issue and administer marriage licenses. Doc. 14 at 13. Secretary Moser contends that he merely is a records' custodian and has neither supervisory authority over judicial officials who issue marriage licenses nor any other involvement administering marriage laws. Defendants rely on the Tenth Circuit's first decision in *Bishop*, where the court concluded that the general duty of

---

[6] The standing requirement is judged by the claims asserted in the Complaint. While they are not germane to plaintiffs' motion for preliminary relief, the Complaint also asserts "recognition" claims, *i.e.*, claims seeking to require defendants to recognize plaintiffs' marriages once licenses have issued and plaintiffs have married. Kansas law shows that Secretary Moser is significantly involved with recognition of marriage in Kansas. *See* K.S.A. § 23-2512 (requiring him to issue, on request, marriage certificates that constitute prima facie evidence of two persons' status as a married couple).

the Governor and Attorney General to enforce Oklahoma's laws lacked sufficient causal connection to satisfy the standing requirement. *Bishop v. Okla.*, 333 F. App'x 361, 365 (10th Cir. 2009). But the present case against Secretary Moser is materially different.

Among other things, Kansas' statutes make Secretary Moser responsible for the following marriage-related activities: supervising the registration of all marriages (K.S.A. § 23-2507); supplying marriage certificate forms to district courts (K.S.A. § 23-2509); and maintaining an index of marriage records and providing certified copies of those records on request (K.S.A. § 23-2512). Secretary Moser's records play an important role in the recognition aspect of plaintiffs' claims. When Secretary Moser distributes certified copies of marriage licenses kept under his supervision, those copies constitute prima facie evidence of the marriages in "all courts and for all purposes." *See* K.S.A. § 23-2512. In short, when Secretary Moser issues a marriage certificate he creates a rebuttable presumption that persons listed in that certificate are married.[7]

Finally, where a plaintiff seeks "'injunctive, as opposed to monetary relief'" against high-level state officials, "'no "direct and personal" involvement is required'" to "'subject them to the equitable jurisdiction of the court.'" *Hauenstein ex rel. Switzer v. Okla. ex rel. Okla. Dep't of Human Servs.*, No. CIV-10-940-M, 2011 WL 1900398, at *4 (W.D. Okla. May 19, 2011) (quoting *Ogden v. United States*, 758 F.2d 1168, 1177 (7th Cir. 1985)). In other words, plaintiffs

---

[7] The parties dispute the significance of Secretary Moser's role in promulgating marriage license forms that require applicants to specify a "bride" and a "groom." Docs. 14 at 2, 20 at 5-6. At least two cases have held that the state official responsible for marriage license forms that exclude same-sex couples is a proper defendant in a case challenging a state's same-sex marriage laws. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (subsequent history omitted) (Virginia's Registrar of Vital Records was a proper defendant because she promulgated marriage license application forms); *Wolf v. Walker*, No. 14-CV-64-BBC, 2014 WL 1729098, at *4 (W.D. Wis. Apr. 30, 2014) (Wisconsin state Registrar was a proper defendant because of his official duty to "prescribe forms for blank applications, statement, consent of parents, affidavits, documents and other forms" related to acquiring a marriage license).

need not establish that Secretary Moser personally denied their marriage license applications so

long as he would play a role in providing their requested relief.  *See Wolf*, 2014 WL 1729098, at

*4.  Given Secretary Moser's responsibility for marriage-related enabling and registration

functions, he has a sufficiently prominent connection to the relief sought by the Complaint to

justify including him as a defendant.

But the standing analysis differs for plaintiffs' claim seeking to recognize same-sex

couples married outside Kansas.  For this claim, plaintiffs have failed to establish Article III

standing.  Neither of the plaintiff couples assert that they entered a valid marriage in another

state that Kansas refuses to recognize.  Nor do they even allege that they sought to marry in

another state and have that marriage recognized in Kansas.  Rather, both couples seek to marry in

Kansas and under the laws of Kansas.  Doc. 1 at ¶ 15.  In sum, plaintiffs have not alleged an

injury in fact attributable to the non-recognition aspect of Kansas' same-sex marriage ban.  This

case differs from *Kitchen* and *Bishop* because both of those cases involved at least one same-sex

couple who had married under the laws of another state.  *Bishop v. Smith*, 760 F.3d 1070, 1075

(10th Cir. 2014) *cert. denied*, No. 14-136, 2014 WL 3854318 (U.S. Oct. 6, 2014); *Kitchen*, 755

F.3d at 1199.

In their Amicus Brief, Phillip and Sandra Unruh assert that the Court may not decide the

constitutionality of Kansas' same-sex marriage ban as applied to male, same-sex couples because

the only plaintiffs are two female, same-sex couples.  Doc. 22 at 7-8.  This argument is a clever

use of the facts but, ultimately, it fails to persuade the Court.[8]  The Court construes plaintiffs'

Complaint to allege that Kansas' laws banning same-sex marriage are ones that are

---

[8] In their Amicus Brief, the Unruhs assert a number of other arguments about the wisdom and
constitutionality of Kansas' same-sex marriage ban.  The Court does not address those arguments
individually because the Tenth Circuit's decisions in *Kitchen* and *Bishop* have decided the issues
they raise in their brief.

unconstitutional on their face (as opposed to a claim challenging the way that Kansas has applied those laws to them). A claim is a facial challenge when "it is not limited to plaintiffs' particular case, but challenges application of the law more broadly." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). If plaintiffs succeed in establishing no circumstances exist under which Kansas could apply its same-sex marriage ban permissibly, the Court may invalidate the laws in their entirety, including their application to male, same-sex couples. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012) ("[A] successful facial attack means the statute is wholly invalid and cannot be applied to anyone.") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 698-99 (7th Cir. 2011))

In sum, plaintiffs' Complaint asserts sufficient facts and claims to satisfy all three components of *Lujan*'s standard. Consequently, the Court concludes that an actual case or controversy exists between all four plaintiffs and all three defendants.

### B. Sovereign Immunity

Defendants next assert that the Eleventh Amendment and 42 U.S.C. § 1983 prohibit a federal court from issuing injunctive relief against a state judicial officer. Docs. 14 at 10-14, 15 at 5-7. Defendants advance three principal arguments as support for this proposition.

First, the two Clerk defendants argue that 42 U.S.C. § 1983 expressly prohibits injunctive relief against judicial officers. Supporting their argument, defendants cite the plain text of § 1983, which provides:

> Every person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, *except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable*.

(emphasis added).  Defendants correctly point out that the Clerks are "judicial officers" for purposes of the judicial immunity provision of § 1983.  *Lundahl v. Zimmer*, 296 F.3d 936, 939 (10th Cir. 2002).  However, § 1983 contains a significant caveat—the "acts or omissions" at issue must be ones taken in the "officer's judicial capacity."  *Id.*; *Mireles v. Waco*, 502 U.S. 9, 11 (1991); 42 U.S.C. § 1983.  Thus, to determine whether judicial immunity applies to the Clerks, the Court must determine whether issuing marriage licenses constitutes a judicial act.

"In determining whether an act by a judge [or here, a clerk of the judicial system] is 'judicial,' thereby warranting absolute immunity, [courts] are to take a functional approach, for such 'immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.'"  *Bliven v. Hunt*, 579 F.3d 204, 209-10 (2d Cir. 2009) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)) (emphasis in original).  "[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity."  *Stump v. Sparkman*, 435 U.S. 349, 362 (1978).  Kansas law distinguishes between a clerk's "judicial" and "ministerial" functions by asking whether "a statute imposes a duty upon the clerk to act in a certain way leaving the clerk no discretion."  *Cook v. City of Topeka*, 654 P.2d 953, 957 (Kan. 1982).

Judged by these criteria, the issuance of marriage licenses under Kansas law is a ministerial act, not a judicial act.  When K.S.A. § 23-2505 describes the Clerk's duty to issue marriage licenses, the statute uses mandatory language and does not allow for any discretion by the Clerks.  *Id.* § 23-2505(a) ("The clerks of the district courts or judges thereof, when applied for a marriage license by any person who is one of the parties to the proposed marriage and who is legally entitled to a marriage license, *shall* issue a marriage license . . . .") (emphasis added).

14

Thus, if applicants for a marriage license meet the statutory qualifications for marriage, the clerk has no discretion to deny them a marriage license.

Moreover, Chief Judge Fairchild's Administrative Order in Douglas County leaves no doubt that Kansas judges regard issuing marriage licenses as a ministerial and not a judicial function. When his Administrative Order explained why Clerk Hamilton was not issuing a marriage license to plaintiffs Marie and Brown, he wrote, "[t]he court performs an administrative function when it issues a marriage license . . . . The Court's role in administrative matters is to apply and follow the existing laws of the State of Kansas." Seventh Judicial District Administrative Order 14-13 (Doc. 23-7 at 3). Indeed, as Chief Judge Fairchild explained, no same-sex marriage licenses could issue despite the Tenth Circuit's decisions in *Kitchen* and *Bishop* because issuing marriage licenses is not a judicial act. *Id.* ("This court may not make a determination as to the validity of this constitutional provision without a justiciable case before it concerning the court's issuance of or failure to issue a marriage license.").

The Tenth Circuit reached the same conclusion during the first *Bishop* appeal. 333 F. App'x at 365. It recognized, under laws similar to Kansas', that Oklahoma district court clerks perform a ministerial function when they issue marriage licenses. *Id.* By the time the case returned to the Tenth Circuit following remand, plaintiffs had added district court clerks as defendants. *Bishop*, 760 F.3d at 1075. The Tenth Circuit confirmed that the clerks' function administering marriage licenses was a ministerial one. *Id.* at 1092 ("[Clerks] are responsible for faithfully applying Oklahoma law, and Oklahoma law clearly instructs both of them to withhold marital status from same-sex couples."). Judicial immunity under 42 U.S.C. § 1983, therefore, does not apply.

Defendants' second immunity argument contends that plaintiffs' seek "retroactive" relief, which, they assert, the Eleventh Amendment does not allow against state officials acting in their official capacities.  Generally, the Eleventh Amendment bars suits brought by individuals against state officials acting in their official capacities.  *Harris v. Owens*, 264 F.3d 1282, 1289 (10th Cir. 2001).  However, under *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief."  *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012) (citations omitted).  If both aspects of this test are met, *Ex parte Young* allows a court to enjoin a state official from enforcing an unconstitutional statute.  *Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013).

Defendant Moser asserts that plaintiffs have failed to bring a proper *Ex parte Young* suit because plaintiffs only seek to remedy a past refusal to issue marriage licenses instead of seeking prospective relief for an ongoing deprivation of their constitutional rights.  The Court disagrees.  Plaintiffs are not seeking to correct or collect damages for the Clerks' inability to issue marriage licenses in the past.  Instead, plaintiffs seek a preliminary and permanent injunction prohibiting the Clerks from enforcing the Kansas same-sex marriage ban in the future.  As a result, the concern protected by the Eleventh Amendments' ban against retroactive relief—federal courts awarding monetary damages that states must pay from their general revenues—is not implicated.  *See Edelman v. Jordan*, 415 U.S. 651, 664-65 (1974).  The Court concludes that plaintiffs seek prospective relief for an ongoing deprivation of their constitutional rights.  As such, their requested relief falls within the *Ex parte Young* exception to sovereign immunity.

Last, defendants contend that the Anti-Injunction Act, 28 U.S.C. § 2283, prohibits the Court from enjoining them.  Defendants' argument reasons that an injunction prohibiting them

from enforcing Kansas' ban against same-sex marriages would interfere with a stay order entered by the Kansas Supreme Court in *State of Kansas ex rel. Schmidt v. Moriarity*, No. 112,590 (Kan. Oct. 10, 2014) (contained in record as Doc. 14-1).  This argument ignores an important exception to the Anti-Injunction Act.  The Anti-Injunction Act provides, "A court of the United States may not grant an injunction to stay proceedings in a State court *except as expressly authorized by Act of Congress*, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283 (emphasis added).  The Supreme Court has held that a suit seeking to enjoin deprivation of constitutional rights under 42 U.S.C. § 1983 falls within the "expressly authorized" exception to the act's general rule.  *See Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972).  Likewise, plaintiffs' suit here falls squarely within this exception, negating defendants' argument under this act.

Defendants persist, however.  They argue that even if the Anti-Injunction Act does not apply directly, the requested injunction nonetheless implicates the policies the act protects.  This argument also relies on the stay order entered by the Kansas Supreme Court in *Moriarity*, (Doc. 14-1).  While defendants' argument is a colorable one, it is miscast as one under the Anti-Injunction Act.  The federal courts have addressed this concern under the rubric of the *Younger* abstention doctrine, as applied to § 1983 cases, and not as a concern predicated on the Anti-Injunction Act.  *See* Erwin Chemerinsky, *Federal Jurisdiction* 770 (6th ed. 2012).  Consistent with this approach, the Court addresses the substance of defendants' argument as part of its discussion of abstention doctrines, below at pages 18-26.

## C. Domestic Relations Exception

Defendant Moser asserts that the Court should decline jurisdiction because states have exclusive control over domestic relations.  Secretary Moser cites *United States v. Windsor*,

__U.S.__, 133 S. Ct. 2675 (2013) for two propositions in support of this assertion:  that states

have exclusive control over domestic relations; and no federal law may contradict a state's

definition of marriage.

Secretary Moser's argument misapprehends *Windsor*.  *Windsor* held that the federal

government may not give unequal treatment to participants in same-sex marriages recognized by

states that permit same-sex marriage as a matter of state law.  133 S. Ct. at 2795-96.  Moreover,

*Windsor* made clear that although "regulation of domestic relations is an area that has long been

regarded as a virtually exclusive province of the states," state marriage laws "of course, must

respect the constitutional rights of persons."  *Id.* at 2691 (citing *Loving v. Virginia*, 388 U.S. 1

(1967) (internal quotations and further citations omitted)).

The domestic relations exception Secretary Moser invokes is a narrow exception to

federal court diversity jurisdiction and it "encompasses only cases involving the issuance of a

divorce, alimony, or child custody decree."  *Ankenbrandt v. Richards*, 504 U.S. 689, 692, 704

(1992).  This exception does not apply to cases like this one, where a federal court has

jurisdiction over a case because that case presents a "federal question."  *Atwood v. Fort Peck*

*Tribal Court Assiniboine*, 513 F.3d 943, 946-47 (9th Cir. 2008).  Nor does it apply to

constitutional challenges to an underlying statutory scheme.  *Johnson v. Rodrigues (Orozco)*, 226

F.3d 1103, 1111 (10th Cir. 2000).

### D. Abstention

While "the Constitution and Congress equip federal courts with authority to void state

laws that transgress federal civil rights, . . . comity toward state sovereignty counsels the power

be sparingly used."  *Moe v. Dinkins*, 635 F.2d 1045, 1046 (2d Cir. 1980).  In this case especially,

plaintiffs ask the Court to enter a particularly sensitive issue of state social policy.  *Smelt v. Cnty.*

*of Orange*, 447 F.3d 673, 681 (9th Cir. 2006).  Recognizing the delicate balance of sovereignty implicated by plaintiffs' request, the doctrine of abstention authorizes a federal court to decline to exercise jurisdiction if federal court adjudication would "cause undue interference with state proceedings."  *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 350, 359 (1989).

But likewise, "federal courts are obliged to decide cases within the scope of federal jurisdiction."  *Sprint Commc'ns, Inc. v. Jacobs*, __ U.S. __, 134 S. Ct. 584, 588 (2013).  Even in cases where permissible, abstention under any doctrine is "the exception, not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). Abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."  *Id.* (citations omitted).  The following four subsections address the propriety of abstention under three doctrines raised on the Court's own motion (the first three), and one raised by defendants.

### 1. *Pullman* Abstention

Under the abstention doctrine of *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984).  "*Pullman* abstention is limited to uncertain questions of state law."  *Id.* (citing *Colorado River*, 424 U.S. at 813).  If the meaning or method of enforcing a law is unsettled, federal courts should abstain so that a state court has an opportunity to interpret the law.  *Id.*  If the state court might construe the law in a way that obviates the need to decide a federal question, abstention prevents "both unnecessary adjudication . . . and 'needless friction with state policies.'"  *Id.* (quoting *Pullman*, 312 U.S. at

500).  Conversely, "Where there is no ambiguity in the state statute, the federal court should not

abstain but should proceed to decide the federal constitutional claim.  We would negate the

history of the enlargement of the jurisdiction of the federal district courts, if we held the federal

court should stay its hand and not decide the question before the state courts decided it."  *Wis. v.*

*Constantineau*, 400 U.S. 433, 439 (1971) (citations omitted); *see also Zwickler v. Koota*, 389

U.S. 241, 251 (1967) (a federal court should not abstain under *Pullman* simply to give a state

court the first opportunity to decide a federal constitutional claim).

The Court does not detect, nor have defendants pointed to any ambiguity or uncertainty

in the Kansas laws plaintiffs challenge.  The challenged laws unequivocally prohibit plaintiffs

and other same-sex couples from procuring a marriage license and marrying a person of the same

sex in Kansas.  Kan. Const. art. 15, §16; K.S.A. §§ 23-2501 and 23-2508.  State officials have

applied these laws to plaintiffs consistent with their plain meaning.  *See* Docs. 4-1 at ¶ 5, 4-3 at ¶

5, 4-4 at ¶ 5.  Thus, the challenged laws are not subject to an interpretation that might avoid or

modify the federal constitutional questions raised by plaintiffs.  As a result, the critical concern

underlying *Pullman* abstention—avoidance of unnecessary state-federal friction where deference

to a state court decision may negate the federal question involved—is missing.

## 2.  *Younger* **Abstention**

On the same day plaintiffs filed this action, Kansas' Attorney General Eric Schmidt filed

a mandamus action with the Kansas Supreme Court.  *Moriarty*, Case No. 112,590 (Kan. Oct. 10,

2014) (Doc. 14-1).  This mandamus action stemmed from an Administrative Order order entered

by a Kansas state court trial judge in Johnson County, Kansas, who, in the wake of the Supreme

Court's decision not to grant certiorari in *Kitchen* or *Bishop*, directed the clerk of his court to

begin issuing Kansas marriage licenses to same-sex couples.  General Schmidt asked the Kansas

Supreme Court to vacate the Johnson County, Kansas Administrative Order, or at least to stay its effect.  Though the Kansas Supreme Court recognized that the Tenth Circuit's decisions in *Kitchen* and *Bishop* may present a valid defense to the Attorney General's mandamus action, it granted a "temporary stay" of the trial judge's order directing the Johnson County clerk to issue marriage licenses to same-sex couples.  Doc. 14-1 at 2.  The Kansas Supreme Court set a briefing deadline for October 28, 2014, and will hold oral arguments on November 6, 2014.  *Id.* at 3.

The Kansas Supreme Court's stay order also specifies the issues pending before it:  (1) whether the Johnson County District Court possessed authority to issue marriage licenses to same-sex couples; (2) whether the Tenth Circuit's interpretation and application  of the United States Constitution in *Kitchen* and *Bishop* are supreme and therefore modify Kansas' ban against same-sex marriage; and (3) even if the Tenth Circuit rulings are supreme, whether Kansas' same-sex marriage laws are otherwise permissible under the United States Constitution.  *Id.*  Because the issues specified in *Moriarty* might resolve the constitutional questions presented here, and because an injunction could interfere with those state proceedings, the Court considers whether it should abstain from adjudicating this action under the principles of *Younger v. Harris*, 401 U.S. 37 (1971).

The *Younger* doctrine reflects "longstanding public policy against federal court interference with state court proceedings."  *Id.* at 43.  The doctrine holds that, for reasons of state sovereignty and comity in state-federal relations, federal courts should not enjoin state judicial proceedings.  *Younger* abstention is required when:  (1) there is an ongoing state judicial proceeding involving the federal plaintiff; (2) that implicates important state interests; and (3) the proceeding provides an adequate opportunity for the federal plaintiff to assert his or her federal claims.  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

21

Originally, *Younger* abstention applied only to concurrent state court criminal proceedings. *Younger*, 401 U.S. at 53. But the doctrine's scope has expanded gradually, and in its current form it also prevents federal courts from interfering with state civil and administrative proceedings. *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987) (federal courts may not enjoin pending state court civil proceedings between private parties); *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 629 (1986) (federal courts may not enjoin pending state administrative proceedings involving important state interests). Moreover, the Supreme Court also has expanded *Younger*'s restrictions against federal court injunctions to include requests for declaratory relief because "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that [*Younger* abstention] was designed to prevent." *Samuels v. Mackell*, 401 U.S. 66, 72 (1971).

But even though *Moriarty* might resolve the issues presented here, the Court concludes that *Younger* abstention is not appropriate. Two independent reasons lead the Court to this conclusion. First, and most, plaintiffs are not a party in *Moriarty* and therefore cannot assert their constitutional claims in that proceeding. As a result, a critical element of the *Younger* formulation is absent. "[A]bstention is mandated under *Younger* only when the federal plaintiff is actually a party to the state proceeding; the [*Younger*] doctrine does not bar non-parties from raising constitutional claims in federal court, even if the same claims are being addressed in a concurrent state proceeding involving similarly situated parties." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928-29 (1975) (cited in *Blackwelder v. Safnauer*, 689 F. Supp. 106, 119 (N.D.N.Y. 1988)).

Second, even if plaintiffs had asserted their claims in *Moriarty*, the Supreme Court has narrowed *Younger*'s application in civil proceedings to three "exceptional circumstances."

*Sprint Comm'ns, Inc. v. Jacobs*, __ U.S. __, 134 S. Ct. 584, 586 (2013).  None of the three is present here.  *Younger* precludes federal interference with ongoing state criminal prosecutions, certain ongoing civil enforcement proceedings akin to criminal prosecutions, and pending civil proceedings involving certain orders that uniquely further the state courts' ability to perform their judicial functions.  In *Jacobs*, the Supreme Court explicitly confirmed *Younger* does not apply "outside these three 'exceptional' categories," and that the three categories define the entirety of *Younger*'s scope.  *Id.* at 586-87 (citing *NOPSI*, 491 U.S. 350, 368 (1989)).

Tacitly recognizing that *Younger* is limited to three exceptional circumstances, defendants strive to fit this case (and derivatively, *Moriarity*) within the third exception—pending state court civil proceedings involving certain orders that uniquely further the Kansas state courts' ability to perform their judicial functions.  They argue that a federal court injunction would interfere with the state courts' efforts to ensure uniform treatment of same-sex marriage licenses across all of Kansas' 105 counties.  This argument is not without any appeal, for the Court recognizes that a decision from a Kansas state court would not raise the comity concerns inherent in a federal court injunction.  But after reviewing the cases where *NOPSI* approved of abstention under this branch of the *Younger* analysis, the Court concludes that abstention is not appropriate.

In *Juidice v. Vail*, 430 U.S. 327, 335 (1977), the Supreme Court held that a federal court should abstain from interfering with a state's contempt process because it is integral to "the regular operation of [the state's] judicial system."  Likewise, in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13-14, (1987), the Court extended *Juidice* to a challenge to Texas' law requiring an appellant to post a bond pending appeal.  As the Court explained, both "involve[d] challenges to the processes by which the State compels compliance with the judgments of its courts."  *Id.* at

23

13-14.  Both *Juidice* and *Pennzoil* involved processes the state courts used to decide cases and enforce judgments, *i.e.*, functions that are uniquely judicial functions.  In contrast, as the Court already has determined, when Kansas clerks issue marriage licenses they perform a ministerial function.  *See supra* at pp. 14-15.  Accordingly, the stay order in *Moriarty* does not qualify as one uniquely furthering Kansas' courts ability to perform their judicial functions in the sense that the post-*Younger* cases use that phrase.

Because neither plaintiffs nor defendants are parties in *Moriarty* and because the case does not fall within one of the three exceptional categories of civil cases that trigger *Younger* abstention, the Court declines to abstain on this basis.

### 3.  *Colorado River* Abstention

The United States Supreme Court has recognized that, in certain circumstances, it may be appropriate for a federal court to refrain from exercising its jurisdiction to avoid duplicative litigation when there is a concurrent foreign or state court action.  *Colorado River Water Conservation Dist. v. United States.*, 424 U.S. 800 (1976).  Although it is generally classified as an abstention doctrine, *Colorado River* is not truly an abstention doctrine because it "springs from the desire for judicial economy, rather than from constitutional concerns about federal-state comity."  *Rienhardt v. Kelly*, 164 F.3d 1296, 1303 (10th Cir. 1999); *see also Colorado River*, 424 U.S. at 817 ("there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts").  However, "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are

considerably more limited than the circumstances appropriate for abstention." *Colorado River*, 424 U.S. at 818.

*Colorado River* identified four factors that federal courts should consider when deciding whether to abstain under its aegis: the problems that occur when a state and federal court assume jurisdiction over the same res; the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order that the concurrent forums obtained jurisdiction. *Id.* "No one factor is necessarily determinative," but "[o]nly the clearest of justifications will warrant dismissals." *Id.* at 818-19.

The Court finds no clear justification for dismissing this case. This Court and the Kansas Supreme Court have not assumed concurrent jurisdiction over the same res, so there is no exceptional need for unified proceedings. Moreover, concerns about interfering with state proceedings are resolved under a *Younger* analysis, which—as the Court has explained—does not apply here. *See supra* at pp. 20-24. Finally, this case and *Moriarty* are not parallel proceedings for purposes of *Colorado River* because the cases involve different parties and different claims. *Moriarty* is a dispute between two government officials—the Kansas Attorney General and the Chief Judge of the Johnson County, Kansas District Court. Plaintiffs are not involved in *Moriarty*, and although *Moriarty* may have state-wide consequences, it does not directly address issuance of marriage licenses in Douglas or Sedgwick Counties, where plaintiffs live and seek to vindicate their constitutional rights. *See Wolf v. Walker*, 9 F. Supp. 3d 889, 895 (W.D. Wis. 2014) ("Plaintiffs have the right under 42 U.S.C. § 1983 to bring a lawsuit to vindicate their own constitutional rights."); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983) ("[T]he presence of federal-law issues must always be a major consideration weighing against surrender" of jurisdiction under *Colorado River*."). In

sum, this case does not present exceptional circumstances warranting departure from the Court's general obligation to decide cases pending properly before it.

### 4. *Burford* Abstention

Defendants also urge the Court to abstain under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). In *Burford*, the federal court confronted a complex question of Texas oil and gas law governed by a complex state administrative scheme. *Id.* at 318-20. Holding that the federal district court should have dismissed the case, the Supreme Court emphasized the existence of complex state administrative procedures and the need for centralized decision-making when allocating drilling rights. *Id.* at 334. Defendants argue that this case resembles *Burford* because granting plaintiffs' relief would interfere with Kansas' system for uniform administration of marriage licenses and records.

The Court is sympathetic to the burden an injunction places on state officials but does not find Kansas' system for administering the marriage laws to be so complex that state officials will struggle to sort out an injunction banning enforcement of the state's same-sex marriage ban. Nor does this case present the type of issue best left to localized administrative procedures. Rather, this case presents federal constitutional questions, ones squarely within the province and competence of a federal court. *See Johnson v. Rodrigues (Orozco)*, 226 F.3d 1103, 1112 (10th Cir. 2000). Accordingly, the Court declines to abstain under *Burford*.

### E. The *Rooker-Feldman* Doctrine

In supplemental briefing filed with the Court the morning of the preliminary injunction hearing, defendants asserted that the *Rooker-Feldman* doctrine bars plaintiffs' federal court claims. *See* Doc. 24. The *Rooker-Feldman* doctrine provides that federal courts, except for the Supreme Court, cannot directly review state court decisions. In *Exxon Mobil Corp. v. Saudi*

26

*Basic Indus. Corp.*, 544 U.S. 280 (2005), the Supreme Court confined the doctrine's application

to the factual setting presented in the two cases that gave the doctrine its name:  when the losing

parties in a state court case bring a federal suit alleging that the state court ruling was

unconstitutional.  *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v.

Feldman*, 460 U.S. 462 (1983).  Plaintiffs ask this Court to conduct, defendants assert, what

amounts to a "review" of the Kansas' Supreme Court's stay order in *Moriarty*.

Defendants' *Rooker-Feldman* argument is not persuasive.  First, plaintiffs were not

"losing parties" in the *Moriarty* action.  In *Moriarty*, the Kansas Attorney General "prevailed"—

at least for the length of the court's stay—over Chief Judge Moriarty of the Johnson County,

Kansas District Court by obtaining a temporary stay of Judge Moriarty's Administrative Order.

Plaintiffs are not parties to *Moriarty* and "[t]he *Rooker-Feldman* doctrine does not bar actions by

nonparties to the earlier state court judgment."  *Lance v. Dennis*, 546 U.S. 459, 466 (2006).

Nor do plaintiffs in this case seek review of the *Moriarty* stay order—an order that

applies only to applicants in Johnson County.  Plaintiffs seek marriage licenses in Sedgwick and

Douglas Counties.  Instead, plaintiffs here challenge the constitutional validity of a legislative act

and a state constitutional amendment.  Such challenges are permissible under *Rooker-Feldman*

because the doctrine does not bar a federal court from deciding the "validity of a rule

promulgated in a non-judicial proceeding."  *Feldman*, 460 U.S. at 486.  Although this Court's

ruling may affect some aspects of *Moriarty*, concurrent state and federal court litigation over

similar issues does not trigger dismissal under *Rooker-Feldman*.  *See Exxon Mobil*, 544 U.S. at

292 ("neither *Rooker* nor *Feldman* supports the notion that properly invoked concurrent

jurisdiction vanishes if a state court reaches judgment on the same or a related question").

During the injunction hearing, defendants invoked *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281 (1970). Defendants' reliance on this case is also unpersuasive. In that case, a union asked a federal court to enjoin enforcement of a state court injunction against picketing because the state court's injunction violated federal law. *Id.* at 284. The Supreme Court concluded that the union's suit amounted to a request for the federal district court to review the state court's injunction, which *Rooker-Feldman* prohibits. *Id.* at 296. In contrast to the current case, the plaintiff in *Atl. Coast Line* was a party to the state court proceeding and sought review of a judgment—not a legislative act. Consequently, nothing in *Atl. Coast Line* suggests this Court should depart from the well-established rule that the *Rooker-Feldman* doctrine does not bar a federal court challenge to the constitutionality of a state statute by someone who is not a party to the similar state court proceeding.

## II.    Merits of Plaintiffs' Motion

### A.  Standard for a Preliminary Injunction

Having determined that it can, and should, adjudicate plaintiffs' motion on its merits, the Court now turns to plaintiffs' request for a preliminary injunction. Under Fed. R. Civ. P. 65(a), plaintiffs seek a preliminary injunction that:  (1) enjoins the defendants from enforcing Article 15, § 16 of the Kansas Constitution, K.S.A. §§ 23-2501 and 23-2508, and any other law that excludes same-sex couples from marriage, and (2) directs defendants to issue marriage licenses to otherwise-qualified same-sex couples.

A preliminary injunction is an order prohibiting a defendant from taking certain specified actions. In some cases, such an order can mandate the defendant to take (or continue taking) certain actions. The injunction is "preliminary" in the sense that it is entered before the case is ready for a final decision on the merits. The issuance of a preliminary injunction is committed to

the "sound discretion of the trial court . . ." *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986).  A preliminary injunction is considered an "extraordinary and drastic" remedy, one that a court should not grant "unless the movant, by a clear showing, carries the burden of persuasion."  *West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1220, 1221-22 (D. Kan. 1998) (internal quotation omitted).

To obtain a preliminary injunction, a plaintiff must establish four elements:  (1) the plaintiff is substantially likely to succeed on the merits; (2) the plaintiff will suffer irreparable injury if the injunction is denied; (3) the plaintiff's threatened injury outweighs the injury the defendant will suffer if the injunction issues; and (4) the injunction would not be adverse to the public interest.  *Tri-State Generation*, 805 F.2d at 355 (citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980)).  The Court considers each of these elements, in order, below.

**1.  Likelihood of Success on the Merits**

**a.  Tenth Circuit Precedent**

"The Tenth Circuit has adopted [a] liberal definition of the 'probability of success' requirement."  *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir. 1981).  As long as the other three factors favor a preliminary injunction, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."  *Id.* (citing *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (further citations omitted)).  But this general standard is elevated when a plaintiff requests one of the three types of "disfavored" preliminary relief—"those altering the status quo,

'mandatory' preliminary injunctions, [9] and those granting the moving party all the relief it could achieve at trial." *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 n.1 (10th Cir. 2010). When a plaintiff seeks one of the disfavored forms of injunction, he or she must make an elevated showing that establishes the likelihood of success on the merits and the balance of harms favors issuing an injunction. *Id.* (citing *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009)). Here, plaintiffs' motion requests a preliminary injunction that qualifies under each category of disfavored injunction: it would alter the status quo; it would require that defendants undertake some affirmative conduct; and it would grant plaintiffs almost the entire scope of relief they would request at a trial on the merits. *See* Docs. 1 at ¶ 1, 3 at ¶ VI.A. Accordingly, the Court will require plaintiffs to show a strong likelihood of success on the merits.

Two Tenth Circuit opinions, *Kitchen* and *Bishop*, control this part of the preliminary injunction analysis. In *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014), same-sex couples challenged Utah's state statute and state constitutional amendment prohibiting same-sex marriage. They argued that the laws violated their due process and equal protection rights under the Fourteenth Amendment. Utah's state-constitutional provision prohibiting same-sex marriage provided:

> (1) Marriage consists only of the legal union between a man and a woman.
>
> (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect.

Utah Const. art. I, § 29. Utah's statutory same-sex marriage ban provided that:

---

[9] An injunction is "mandatory" if it requires the nonmoving party to perform some affirmative act to comply with it. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

> (1)(a) It is the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter.
>
> (b) Except for the relationship of marriage between a man and a woman recognized pursuant to this chapter, this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married.

U.C.A. § 30-1-4.1.

After finding that the plaintiffs had sued the proper parties for standing purposes, the Tenth Circuit held that the fundamental right to marry includes the right to marry a person of the same sex. *Kitchen*, 755 F.3d at 1201-02, 1218. The Tenth Circuit then examined the challenged laws under the strict scrutiny standard that applies to fundamental rights. *Id.* at 1218. This standard requires that any law infringing on a fundamental right be "narrowly tailored" to promote a "compelling government interest." *Id.* After discussing the government interests Utah said the same-sex marriage ban served, the Tenth Circuit concluded that the laws failed the strict scrutiny standard. *Id.* at 1218-28 (rejecting the following rationales under strict scrutiny: promoting biological reproduction within marriages, promoting optimal childrearing, promoting gendered parenting styles, and accommodating religious freedom and reducing the potential for civic strife). The Tenth Circuit concluded: "[U]nder the Due Process and Equal Protection Clauses of the United States Constitution, those who wish to marry a person of the same sex are entitled to exercise the same fundamental right as is recognized for persons who wish to marry a person of the opposite sex." *Id.* at 1229-30.

In *Bishop v.* Smith, 760 F.3d 1070 (10th Cir. 2014), same-sex couples brought a similar equal protection and due process challenge to Oklahoma's constitutional amendment prohibiting same-sex marriage. Oklahoma's constitutional same-sex marriage ban provided:

> A. Marriage in this state shall consist only of the union of one man and one woman. Neither this Constitution nor any other provision of law shall be

construed to require that marital status or the legal incidents thereof be
conferred upon unmarried couples or groups.

B.   A marriage between persons of the same gender performed in another
state shall not be recognized as valid and binding in this state as of the
date of the marriage.

C.   Any person knowingly issuing a marriage license in violation of this
section shall be guilty of a misdemeanor.

Okla. Const. art. 2, § 35.  After determining that plaintiffs had standing to sue, the Tenth Circuit

held that *Kitchen* controlled the merits of the appeal.  *Bishop*, 760 F.3d at 1076-79.  The Tenth

Circuit considered arguments not addressed in *Kitchen*, but ultimately concluded that they did

not "persuade [the court] to veer from our core holding that states may not, consistent with the

United States Constitution, prohibit same-sex marriages."  *Id.* at 1080-82 (reaffirming *Kitchen*

but also rejecting under strict-scrutiny analysis children's interest in having their biological

parents raise them as a compelling government interest justifying a same-sex marriage ban).

Even under the more exacting standard for disfavored injunctions, plaintiffs have shown

a strong likelihood they will succeed on the merits of their claims.  *Kitchen* and *Bishop* establish

a fundamental right to same-sex marriage, and state laws prohibiting same-sex marriage infringe

upon that right impermissibly.  *Kitchen*, 755 F.3d at 1229-30; *Bishop*, 760 F.3d at 1082.  Kansas'

same-sex marriage ban does not differ in any meaningful respect from the Utah and Oklahoma

laws the Tenth Circuit found unconstitutional.

At the preliminary injunction hearing, defendants' counsel tried to differentiate Kansas—

and its same-sex marriage ban—from the Utah and Oklahoma provisions nullified in *Kitchen* and

*Bishop*.  He argued that Kansas, by statute, recognizes common law marriage and plaintiffs could

achieve married status under the common law variant of marriage.  This argument, even if

accurate, proves too much.  On its best day, this argument contends that Kansas' common law

marriage alternative provides same-sex couples access to a separate but equal classification of

marriage. That is, opposite-sex citizens can marry by either statutory or common law marriage while same-sex couples must confine their marriages to the common law alternative. Thus, defendants' alternative way of looking at the same-sex ban still denies plaintiffs equal protection of Kansas' marriage laws.

Because Tenth Circuit precedent is binding on this Court, *Kitchen* and *Bishop* dictate the result here. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit . . ."); *Phillips v. Moore*, 164 F. Supp. 2d 1245, 1258 (D. Kan. 2001) ("The [district] court, of course, is bound by circuit precedent"). The Court concludes, therefore, that plaintiffs have shown a strong likelihood that they will succeed in establishing that Article 15, § 16 of the Kansas Constitution and K.S.A. § 23-2501 violate their rights guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

### b.  Role of Kansas State Court Precedent

Defendants contend that the Kansas Court of Appeals decision *In re Estate of Gardiner*, 22 P.3d 1086 (Kan. Ct. App. 2001), *aff'd in part, rev'd in part*, 42 P.3d 120 (Kan. 2002) controls the constitutional questions raised by plaintiffs' motion. In *Gardiner*, the Kansas Court of Appeals rejected plaintiff's claim that Kansas' prohibition against recognizing same-sex marriages violated the Fourteenth Amendment of the United State Constitution. *Id.* at 125-26. Defendants assert that this Court now must follow *Gardiner* for two reasons: (1) 28 U.S.C. § 1738 obligates federal courts to honor the decisions of state courts; and (2) the United States Supreme Court's denial of certiorari in *Gardiner* elevated the precedential effect of that decision to one that is binding on all federal courts. The Court disagrees with both propositions.

Title 28 U.S.C. § 1738 is the full faith and credit statute that applies in federal court.  This statute requires federal courts to give the same preclusive effect to a state court *judgment* that another court of the same state would give to it.  In other words, under 28 U.S.C. § 1738, a federal court must look to law of the judgment-rendering state to determine the preclusive effect of a state court judgment.  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 375 (1985).  But defendants' argument confuses judgment and precedent.  A "judgment" represents a court's final determination of the parties' rights after their case has been litigated to its conclusion.  In contrast, "precedent" consists of the body of decisional rules established in previous cases that courts must apply later when deciding like cases.  Section 1738 obligates federal courts to honor state court judgments, not follow their precedent.  Moreover, for § 1738 purposes, a state court judgment precludes subsequent federal litigation only if it involved the same parties, the same claim, and resulted in a final decision on the merits.  *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998).  Neither plaintiffs nor defendants were parties in *Gardiner*.  Thus, 28 U.S.C. § 1738 does not obligate this Court to honor the judgment rendered in *Gardiner* or follow its precedent.

Nor does the Supreme Court's decision declining to issue a writ of certiorari confer precedential effect on *Gardiner* in a way that binds the federal courts.  It is well-settled that a denial of certiorari creates no precedential value.  *Teague v. Lane*, 489 U.S. 288, 296 (1989) ("As we have often stated, the 'denial of a writ of certiorari imports no expression of opinion upon the merits of the case.'") (quoting *United States v. Carver*, 260 U.S. 482, 490 (1923)); *United States v. Mitchell*, 783 F.2d 971, 977 (10th Cir. 1986) ("[n]o precedential conclusion can be drawn from the denial of certiorari").  This is especially true here, because the *Gardiner* plaintiff abandoned his constitutional attack on Kansas' same-sex marriage laws before he took his appeal to the

Kansas Supreme Court.  *See* 42 P.3d 120.  Thus, the only consideration of Kansas' same-sex marriage laws came in the Kansas Court of Appeals' opinion—one the United States Supreme Court was never asked to review.

In sum, defendants have failed to persuade the Court to depart from two well-settled decisional principles:  first, that federal courts are not bound by state court interpretations of federal constitutional issues, *see Tighe v. B.C. Christopher Sec. Co*., No. 91-4219-SAC, 1994 WL 191876, at *5 n.7 (D. Kan. Apr. 22, 1994) (citing *Mullaney v. Wilbur*, 421 U.S. 684, 690-91 (1975)); and second, that a federal district court must follow the precedent of its Circuit. *Spedalieri*, 910 F.2d at 709.

### 2.   Irreparable Injury

Plaintiffs have shown they likely will suffer irreparable injury if the Court does not issue a preliminary injunction.  "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quotation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012); *Quinly v. City of Prairie Village*, 446 F. Supp. 2d 1233, 1237-38 (D. Kan. 2006).  Moreover, the Court would be "unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain," further favoring a finding of irreparable injury.  *Awad*, 670 F.3d at 1131.  Thus, the Court concludes that plaintiffs have satisfied the irreparable injury requirement by showing a likely violation of their constitutional rights.

### 3.   Balance of Harm

Next, plaintiffs have shown that their threatened injury outweighs any injury defendants would experience from the injunction.  "[W]hen a law is likely unconstitutional, the interests of

those [whom] the government represents, such as voters[,] do not outweigh a plaintiff's interest in having [her] constitutional rights protected." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (plurality) (quoting *Awad*, 670 F.3d at 1131) (internal alterations omitted), *aff'd*, __ U.S. __ ,134 S. Ct. 2751 (2014).  On these facts, Tenth Circuit precedent requires the Court to conclude that the balance of harm analysis favors injunctive relief.

### 4.  Public Interest

Last, the Court must determine whether granting an injunction would be adverse to the public interest.  Here, competing considerations collide head-on.  On one hand, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby*, 723 F.3d at 1145 (quoting *Awad*, 670 F.3d at 1131-32).  On the other hand, the public interest values enforcement of democratically enacted laws.  This latter value must yield though, when binding precedent shows that the laws are unconstitutional.  In this setting, the public's interest in enforcement must give way to the "more profound and long-term interest in upholding an individual's constitutional rights." *Awad*, 670 F.3d at 1132 (quotation omitted).  Consistent with this precedent, the Court concludes that the public interest favors protecting plaintiffs' constitutional rights by enjoining Kansas' plainly unconstitutional provisions.

## III.   <u>Effective Date of Preliminary Injunction</u>

Finally, defendants have asked the Court to stay any injunction it might enter temporarily, while they appeal to the Tenth Circuit.  Under Fed. R. Civ. P. 62(c), a court may suspend or modify an injunction during the pendency of an appeal to secure the opposing party's rights. *See also Rhines v. Weber*, 544 U.S. 269, 276 (2005) (holding district courts "ordinarily have authority to issue stays . . . where such a stay would be a proper exercise of discretion").

The purpose of a stay is to preserve the status quo while the opposing party pursues its appeal. *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1020 (10th Cir. 1996).

In the same-sex marriage decisions that followed *Kitchen* and *Bishop*, several federal district courts have stayed the effect of their decisions to permit defendant to exhaust its appeal rights. *See, e.g.*, *Guzzo v. Mead*, No. 14-CV-200-SWS, 2014 WL 5317797, at *7 (D. Wyo. Oct. 17, 2014) (granting request for stay pending appeal); *Evans v. Utah*, No. 2:14CV55DAK, 2014 WL 2048343, at *18 (D. Utah May 19, 2014) (granting request for stay pending appeal despite factors weighing against it). Judge Skavdahl explained why in *Guzzo*:

> The Court is sympathetic to the mounting irreparable harms faced by Plaintiffs. However, the many changes that result from this ruling are very serious and deserve as much finality as the Court can guarantee. Given the fundamental issues apparent in this case, it is in the litigants' and the public's interest to ensure the correct decision is rendered. It would only cause a great deal of harm and heartache if this Court allowed same-sex marriage to proceed immediately, only to have a reviewing court later nullify this decision (and with it, the same-sex marriages occurring in the interim).

2014 WL 5317797, at *7.

Defendants' stay request presents a relatively close call. As *Guzzo* explained, the Tenth Circuit has settled the substance of the constitutional challenge plaintiffs' motion presents. *Id.* at *5. And under the Circuit's decisions, Kansas law is encroaching on plaintiffs constitutional rights. But defendants' arguments have required the Court to make several jurisdictional and justiciability determinations, and human fallibility is what it is; the Circuit may come to a different conclusion about one of these threshold determinations. On balance, the Court concludes that a short-term stay is the safer and wiser course.

Consequently, the Court grants the preliminary injunction described below but stays the effective date of that injunction until 5:00 p.m. (CST) on Tuesday, November 11, 2014 (unless defendants sooner inform the Court that they will not seek review from the Circuit). This will

permit adequate time for defendants to appeal from this Order and try to convince the Tenth

Circuit that it should stay the Court's preliminary injunction for a longer period.  This stay will

provide the added benefit of giving the defendant Clerks and Secretary Moser adequate time to

prepare to honor the injunction—assuming the Court of Appeals does not stay or vacate the

Court's injunction.  But unless defendants convince the Tenth Circuit to order an additional stay,

the injunction imposed by the Order will go into effect at 5:00 p.m. (CST) on Tuesday,

November 11, 2014.

### Conclusion

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for a

Preliminary Injunction is granted (Doc. 3).  Defendants are hereby enjoined from enforcing or

applying Article 15, § 16 of the Kansas Constitution and K.S.A. § 23-2501 and any other Kansas

statute, law, policy or practice that prohibits issuance of marriage licenses to same-sex couples in

Kansas.  Defendants may not refuse to issue marriage licenses on the basis that applicants are

members of the same sex.  The Court also orders that defendants' request for a temporary stay of

the preliminary injunction is granted.  The preliminary injunction is stayed and will not take

effect until 5:00 p.m. (CST) on Tuesday, November 11, 2014, unless defendants sooner inform

the Court they will not seek review before the Court of Appeals.

Finally, plaintiffs' motion for a temporary restraining order is denied as moot.

**IT IS SO ORDERED.**

**Dated this 4th day of November, 2014, at Kansas City, Kansas.**


**Daniel D. Crabtree**
**United States District Judge**