## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KAIL MARIE, et al.,

       Plaintiffs,

v.

SUSAN MOSIER, M.D., in her official
capacity as Secretary of the Kansas
Department of Health and Environment,
et al.,

       Defendants.

Case No. 14-cv-02518-DDC-TJJ

## MEMORANDUM AND ORDER

Six weeks ago, in *Obergefell v. Hodges*, the United States Supreme Court ruled that state laws banning same-sex marriage violate due process and equal protection rights guaranteed by our Constitution.[1]  Given this ruling, one might ask whether there is any work left to do in this lawsuit, one challenging the constitutionality of the Kansas laws against same-sex marriage.  The litigants in this case disagree sharply about the right answer to this question.  Plaintiffs contend that *Obergefell* strengthened their right to relief; defendants claim that the case is now moot and the Court should dismiss it.  To resolve this issue, the Court must apply a set of legal principles that originate in the Constitution's limits on federal judicial power and it must honor the delicate role that federal courts play in a dual-sovereign system of government.  For reasons that this Order explains, the Court concludes that it should rule on at least some of plaintiffs' claims in this case.

To understand this conclusion, one must remember what was at issue in *Obergefell*, and what was not.  That case considered same-sex marriage bans enacted in Michigan, Ohio,

---

[1] No. 14-556, 2015 WL 2473451 (U.S. June 26, 2015).

Kentucky, and Tennessee.  It did not rule, at least not directly, on Kansas' ban against such marriages.  The Court's job now is to apply *Obergefell* to the Kansas laws, and this Order does so.  As one would expect, the Court holds that the Kansas ban against same-sex marriage also violates the due process and equal protection clauses of the Constitution.

This leads to one more question that the Court must decide:  What relief should follow from this determination?  Plaintiffs have asked for two kinds of relief:  (1) an explicit declaration that Kansas' same-sex marriage laws (and related policies) violate the Constitution and thus are void; and (2) a permanent injunction forbidding defendants (and their successors) from ever enforcing these invalid laws.  The Court concludes that plaintiffs are entitled to the first form of relief, and this Order grants the explicit declaration they seek.  But the second form of requested relief—a permanent injunction—presents a more difficult and nuanced proposition.

Our Circuit has explained that whenever a federal court is asked to issue an injunction against governmental officials, it must exercise its "remedial discretion" carefully.  *See Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012).  Likewise, a federal court must "mould each [remedial] decree to the necessities of a particular case," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944), and consider, among other things, any remedial commitments that defendants have offered.  *See Winzler*, 681 F.3d at 1210.  Here, defendants' attorneys have advised that once *Obergefell* was decided, Kansas officials have taken steps to comply with it.  Counsel also has represented that defendants will continue to comply in the future.  But some facts in the summary judgment record suggest that Kansas officials have not uniformly complied with *Obergefell*'s rule.  These facts concern the Court, and raise questions about the efficacy of the remedial commitments defendants' attorneys have offered.

Trying to balance all these factors on one scale is not a simple task.  Federal judicial power must be invoked carefully and thoughtfully.  Also, there is value in giving public officials a reasonable opportunity to comply voluntarily with a rule of law established by the Supreme Court—even if, and perhaps especially if, those officials disagree with the ruling.  And yet, the Court has a duty to protect the rights conferred on citizens by our Constitution.  The Court has decided to balance these competing considerations in the following fashion.

First and as already explained, the Court grants the declaratory relief plaintiffs have requested.  The Kansas laws and policies banning same-sex marriage are unconstitutional.  The complete terms of the Court's declaratory judgment are set forth at the end of this Order.

Second, the Court declines—for the moment, anyway—to issue the sweeping permanent injunction plaintiffs request.  The Court defers its final decision on this form of relief until the record reveals more fully whether Kansas officials are doing what their attorneys have assured the Court they will do:  comply with *Obergefell* voluntarily.

Last, the Court will permit the parties to make additional submissions showing whether defendants have made good on the remedial assurances that their counsel has offered.  Each side may submit any additional statement of facts that they wish the Court to consider no later than September 15, 2015.  If circumstances warrant, the parties may make earlier submissions.  The parties will have 21 days to respond to any statement submitted by the other.  If admissible evidence establishes that defendants are not complying with *Obergefell*, the Court will apply the legal standards summarized in this Order and rule this remaining aspect of plaintiffs' motion for summary judgment.[2]

---

[2] The Court will consider any material that the parties submit, but it encourages the parties' submissions to honor three limitations:  (a) any additional submission of facts must comply with the Federal Rules of Civil Procedure (and our Court's local rules) and thus be based on admissible evidence; (b) any such additional statement should focus on events occurring after July 21, 2015, when the parties made their last round of submissions in this

The Court realizes this approach has an undesirable effect: it prolongs this lawsuit, albeit marginally. But the Court believes that this detriment is more than outweighed by the benefit of a fuller record that will inform the Court's exercise of its remedial discretion.

## I.    Procedural Background

Plaintiffs filed this lawsuit seeking injunctive and declaratory relief under 42 U.S.C. § 1983. They asked the Court to declare unconstitutional certain Kansas laws that prohibit state officials from: (1) licensing same-sex marriages; (2) recognizing same-sex marriages performed under the laws of other states; and (3) conferring on same-sex married couples the legal rights and benefits incident to marriage. They also asked the Court to enjoin state officials from enforcing the Kansas laws that plaintiffs claim are unconstitutional.

When the Court entered its preliminary injunction order last November, it followed binding precedent the Tenth Circuit had established earlier in 2014. *See* Doc. 29 at 30-31 (applying the rule established in *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) (declaring Utah and Oklahoma's same-sex marriage bans unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment)). Then, the Supreme Court decided to consider the constitutional issues presented by various challenges to same-sex marriage. *See* 135 S. Ct. 1039-41 (2015) (granting cert in *Obergefell* and companion cases).

Earlier this summer, the Supreme Court issued its decision. It reached the same conclusion that the Tenth Circuit had reached: State laws forbidding licensing of same-sex marriage and similar law forbidding recognition of same-sex marriages performed in other states violate the Fourteenth Amendment to our Constitution. *Obergefell*, 2015 WL 2473451, at *19.

---

case; and (c) the Court does not believe it needs additional legal argument, and thus the parties should not interpret anything in this Order to invite additional argument.

Thus, the constitutional principles that control this Court's consideration of plaintiffs' challenge to the Kansas laws are the same ones, in substance, that the Court applied in its injunction order. The Court now must apply *Obergefell*'s holding to decide this case's pending motions, mindful of any changed facts or circumstances that this decision may have prompted.

This case now is before the Court on various motions:  (1) Dr. Robert Moser's Motion to Dismiss Amended Complaint (Doc. 57); (2) Douglas Hamilton and Bernie Lubreras' Motion to Dismiss Amended Complaint (Doc. 58); (3) Nick Jordan, Lisa Kaspar, and Mike Michael's Motion to Dismiss for Failure to State a Claim (Doc. 79); (4) defendants' joint Motion to Dismiss (Doc. 120); and (5) plaintiffs' Motion for Summary Judgment (Doc. 85).  Having reviewed the arguments and evidence presented by the parties as support for these motions, the Court grants plaintiffs' motion for summary judgment on their claims for declaratory relief. Conversely, the Court denies summary judgment—at least for the time being—on plaintiffs' claims for injunctive relief.  The rest of this Order explains why.

## II.    Challenged Laws

Plaintiffs ask the Court to declare the Kansas state laws banning same-sex marriages invalid under the Fourteenth Amendment of the United States Constitution and enjoin Kansas officials from enforcing them.  These laws include Article 15, § 16 of the Kansas Constitution, K.S.A. §§ 23-2501 and 23-2508, and "any other Kansas statute, law, policy, or practice that excludes Plaintiffs and other same-sex couples from marriage."  Doc. 52 at 30.

Article 15, § 16 of the Kansas Constitution provides:

(a) The marriage contract is to be considered in law as a civil contract.  Marriage shall be constituted by one man and one woman only.  All other marriages are declared to be contrary to the public policy of this state and are void.

(b) No relationship, other than a marriage, shall be recognized by the state as entitling the parties to the rights or incidents of marriage.

K.S.A. § 23-2501 codifies Kansas' same-sex marriage prohibition as part of the state's statutes, providing:

> The marriage contract is to be considered in law as a civil contract between two parties who are of opposite sex.  All other marriages are declared to be contrary to the public policy of this state and are void.  The consent of the parties is essential. The marriage ceremony may be regarded either as a civil ceremony or as a religious sacrament, but the marriage relation shall only be entered into, maintained or abrogated as provided by law.

By their plain terms, Article 15, § 16 of the Kansas Constitution and K.S.A. § 23-2501 prohibit same-sex couples from getting married under Kansas law.  But K.S.A. § 23-2501 also declares all "other [non-opposite sex] marriages to be contrary to the public policy of the state and . . . void."  A separate statute, K.S.A. § 23-2508, adds depth to Kansas' prohibition, declaring, "It is the strong public policy of this state only to recognize as valid marriages from other states that are between a man and a woman."  These statutes extend Kansas' same-sex marriage ban to forbid state officials from recognizing same-sex marriages performed under another state's laws.

Plaintiffs also challenge other facially neutral laws, asserting that Kansas' same-sex marriage ban requires state officials to apply them in a way that will violate the Constitution. For instance, K.S.A. § 79-32,115 governs a spouse's ability to file state income tax returns under a "married filing" status.  Subsection (c) of this statute provides, "[i]f both husband and wife are residents, and if their federal taxable income is determined on a joint federal return, their Kansas taxable income shall be reported and taxed on the basis of a joint Kansas income tax return." Plaintiffs allege that the Kansas Department of Revenue ("the KDOR") will not permit same-sex married couples to file their tax returns as married couples because Kansas does not recognize same-sex marriages.

Similarly, K.S.A. § 8-246(a)(1) describes the Kansas Division of Vehicle's ("the KDV") duty to issue replacement driver's licenses to spouses who marry and change their last names during the marriage licensing process:

> (a) If a driver's license issued under the provisions of this act is lost or destroyed, or if a new name is acquired, the person to whom such driver's license was issued may obtain a replacement upon:
>
> (1) Furnishing satisfactory proof of the loss, destruction or name change to the division, including an affidavit stating the circumstances of the loss, destruction or name change[.]

Recently married persons can furnish the KDV with "satisfactory proof" of a name change by submitting "[a] certified copy of a person's marriage license," which, according to the statute, "shall constitute proof of identity for the purposes of issuance of any Kansas driver's license or nondriver's identification."  K.S.A. § 23-2506(d).  As same-sex couples, plaintiffs contend that the KDV has applied Kansas' same-sex marriage ban to keep them from using this procedure to obtain a driver's license in their married names.

Finally, K.A.R. § 108-1-1(g)(1), a Kansas administrative regulation, decides whether the spouse of a state employee can qualify for coverage under Kansas' State Employee Health Plan ("the SEHP").  The regulation defines an "eligible dependent participant" as, among other things:  "The primary participant's lawful wife or husband, *as recognized by Kansas law*[.]" K.A.R. § 108-1-1(g)(1)(A) (emphasis added).  Two plaintiffs in this case claim that their employers, two Kansas universities, returned their requests to add their spouses to their healthcare plans because the SEHP does not extend spousal benefits to marriages not recognized under Kansas law, *i.e.*, same-sex marriages.

III.     **Factual Background**

The facts material to plaintiffs' motion for summary judgment are set forth below.

Where controverted facts exist, the Court has resolved them in favor of defendants as the parties

opposing summary judgment.

**A.  The Licensing Plaintiffs**

**1.   Kail Marie and Michelle Brown**

Plaintiffs Kail Marie and Michelle Brown live together in Lecompton, Kansas, in

Douglas County.  Ms. Marie and Ms. Brown have lived in a committed relationship for 20 years.

Except that they both are women, Ms. Marie and Ms. Brown meet all qualifications for marriage

in the state of Kansas.  On October 8, 2012, Ms. Marie appeared at the office of the Clerk of the

Douglas County, Kansas District Court to apply for a marriage license so that she and Ms.

Brown could marry one another.  The deputy clerk, acting under the supervision of Clerk

Hamilton, one of the defendants here, asked for Ms. Marie's and Ms. Brown's personal

information and identification, and recorded it on an application form.  The deputy clerk then

gave the form to Ms. Marie and instructed her to return it no sooner than Monday, October 13—

after Kansas' statutory three-day waiting period for issuing a marriage license had expired.

The next day, District Judge Robert Fairchild, the Chief Judge of the Seventh Judicial

District, which consists of Douglas County, issued Administrative Order 14-13.  In pertinent

part, Chief Judge Fairchild's Order concluded:

> The court performs an administrative function when it issues a marriage license.
> . . . The Court's role in administrative matters is to apply and follow the existing
> laws of the State of Kansas.  Recently, the United States Supreme Court declined
> to review several cases in which the [federal] Circuit Courts held that similar
> provisions contained in the constitutions of other states violate the United States
> Constitution.  Included in these cases were two cases from the Tenth Circuit Court
> of Appeals.  While Kansas is [] within the jurisdiction of the Tenth Circuit, none
> of these cases involved Article 15, §16 of the Kansas Constitution.  This court

8

may not make a determination [about] the validity of this constitutional provision without a justiciable case before it concerning the court's issuance of or failure to issue a marriage license.

Seventh Judicial District Administrative Order 14-13 (Doc. 23-7 at 3-4).  Plaintiffs never say whether Ms. Marie submitted the marriage application or whether the clerk actually denied it. But Judge Fairchild's order made it clear:  the clerk would have denied Ms. Marie's application.

### 2.   Kerry Wilks and Donna DiTrani

Plaintiffs Kerry Wilks and Donna DiTrani have lived in a committed relationship for five years.  The two reside together in Wichita, Kansas, in Sedgwick County.  Except that they both are women, Ms. Wilks and Ms. DiTrani meet all qualifications for marriage in the state of Kansas.  On October 6, 2014, Ms. Wilks and Ms. DiTrani appeared in person at the office of the Clerk of the Sedgwick County District Court.  They went there to apply for a marriage license. A deputy clerk and the clerk's supervisor—both working under the supervision of Clerk Lumbreras, a defendant here—refused to give them a marriage license application because they sought to enter a same-sex marriage.  Ms. Wilks and DiTrani returned to the office of the Clerk of the Sedgwick County District Court on October 7 and October 8.  Each time, a deputy clerk refused to provide them an application for a marriage license.

On October 9, 2014, Ms. Wilks and Ms. DiTrani returned one more time to the office of the Clerk of the Sedgwick County District Court to apply for a marriage license.  This time, a deputy clerk asked them for pertinent information and wrote it down on a marriage application form.  The two then signed the application under oath.  After Ms. Wilks and Ms. DiTrani completed and submitted the marriage license application form, the deputy clerk—reading from a prepared statement—informed them that their application was denied.  The deputy clerk

explained that same-sex marriage violates provisions of the Kansas Constitution, and that the Sedgwick County District Court would not issue marriage licenses to same-sex couples.

**B. The Recognition Plaintiffs**

**1. James Peters and Gary Mohrman**

Plaintiffs James Peters and Gary Mohrman joined this lawsuit when plaintiffs filed the Amended Complaint (Doc. 52). They reside in Lawrence, Kansas, and have lived in a committed same-sex relationship for nearly 35 years. On July 31, 2010, Mr. Peters and Mr. Mohrman married in Iowa, a state that licenses same-sex marriages. Mr. Peters currently is employed by the University of Kansas. His job qualifies him for a number of employee benefits, including eligibility for health insurance under the SEHP.

The SEHP provides participants with a guidebook that explains the benefits that its coverage provides. The booklet for plan year 2015 was issued in October 2014. Doc. 86-3. In a section entitled "Other Eligible Individuals Under the SEHP," the guidebook explains that the SEHP extends dependent coverage to a participant's "lawful wife or husband . . . . (Same gender marriages are not recognized under Kansas Law)." *Id.* at 4 (parenthetical in original). On November 16, 2014, Mr. Peters went to the Human Resources Department at the University of Kansas and applied to add his husband, Mr. Mohrman, as a covered dependent on his healthcare plan. The University of Kansas declined Mr. Peters' request. A representative from the University's Human Resources Department explained that a directive issued by SEHP Director Mike Michael concluded that Mr. Mohrman did not qualify as dependent spouse because Kansas does not recognize same-sex marriages.

When they file their tax returns, Mr. Peters and Mr. Mohrman file their federal returns jointly. The Internal Revenue Service requires married same-sex couples to file their federal

individual income tax returns as "married" if they were married in a state that licenses same-sex marriage. This requirement applies even if the couple resides in a state that does not recognize such marriages. The Kansas Department of Revenue, however, did not allow same-sex couples married under the laws of another state to file as "married." Mr. Peters and Mr. Mohrman thus were required to prepare both married federal tax returns for federal filing purposes and single federal tax returns to file their state tax returns.

### 2.  Carrie Fowler and Sarah Braun

Plaintiffs Carrie Fowler and Sarah Braun, also new plaintiffs in this lawsuit, have lived in a committed same-sex relationship for more than two years. They reside in McClouth, Kansas. Ms. Fowler and Ms. Braun married on June 7, 2014, in Chicago, Illinois. On her Illinois marriage license, Ms. Fowler changed her last name to "Braun,"[3] as Illinois law permits.

After changing her name during the marriage-licensing process, Ms. Fowler changed her last name on record with the Social Security Administration and obtained a new Social Security card reflecting her changed name. On June 25, 2014, she and Ms. Braun went to the driver's license office in Lawrence, Kansas, to obtain a new driver's license under her married name. A representative from the KDV declined to issue a license using her married name, explaining that the KDV does not recognize same-sex marriages.

On November 13, 2014, after the Douglas County district court clerks had begun to issue marriage licenses to same-sex couples, Ms. Fowler again called the KDV office in Lawrence. She asked whether she now could obtain a license under her married name. A representative informed her that the Division of Vehicles still did not recognize same-sex marriages. Ms. Fowler then called the telephone number for the KDV's Driver's Licensing office in Topeka,

---

[3]For clarity, this Memorandum and Order will continue to refer to Carrie Fowler (Braun) as Ms. Fowler.

Kansas.  During this call, she was advised that the KDV had received instructions to follow the Kansas Constitution and thus not recognize same-sex marriages.

### 3.  Darci Jo Bohnenblust and Joleen Hickman

Plaintiffs Darci Jo Bohnenblust and Joleen Hickman, also new plaintiffs in this lawsuit, have lived together in a committed same-sex relationship for more than 19 years.  They reside in Riley, Kansas.  The Riley County district court began issuing marriage licenses to same-sex couples one day after the preliminary injunction order in this case took effect.  The couple married in Riley County on November 13, 2014.  On their Kansas marriage license, Ms. Bohnenblust and Ms. Hickman designated new last names for themselves.  Ms. Bohnenblust changed her last name to "Pottroff" (her birth name), and Ms. Hickman changed her name to "Spain" (also her birth name).

After they married, the couple went to their local KDV office and presented a certified copy of their marriage license.  They asked the KDV to issue new driver's licenses to them using their married last names.  A representative from the KDV returned their request, explaining that the State of Kansas and the KDV do not recognize same-sex marriages.

Ms. Bohnenblust is employed by Kansas State University in Manhattan, Kansas.  Like Mr. Peters, she is eligible for health insurance provided through the SEHP.  On November 22, 2014, Ms. Bohnenblust sent an e-mail to the Human Resources Department at Kansas State University asking to add her spouse, Ms. Hickman, as a dependent on her health insurance plan.  On November 24, 2014, a Human Resources representative responded, and refused Ms. Hickman's request.  The response explained that the SEHP's director, Mike Michael, had advised the University that "same gender couples will remain ineligible" for spousal healthcare benefits because Kansas law does not recognize same-sex marriages.

### C. The Licensing Defendants

#### 1. Susan Mosier, M.D.

Defendant Susan Mosier is the Secretary of the Kansas Department of Health and Environment ("the KDHE").  In November 2014, she assumed the office occupied previously by Dr. Robert Moser.  Secretary Mosier, as was Dr. Moser before her, is responsible for directing Kansas' system of vital records and supervising personnel who manage it.  This position requires Secretary Mosier to furnish forms for marriage licenses, marriage certificates, marriage license worksheets, and applications for marriage licenses used throughout Kansas; maintain a publicly available vital records index of marriages; and publish aggregate data on the number of marriages occurring in Kansas.  Secretary Mosier also is responsible for ensuring that her department executes these functions in compliance Kansas law, including provisions that prohibit same-sex couples from marrying.  Secretary Mosier's responsibilities include furnishing forms that, before the Court issued the preliminary injunction in this case, excluded same-sex couples from marriage by requiring applicants to designate a "bride" and a "groom."  Plaintiffs named Secretary Mosier in her official capacity and alleged that she acted under color of state law at all relevant times.

#### 2. Douglas Hamilton

Defendant Douglas Hamilton is the Clerk of the District Court for Kansas' Seventh Judicial District (Douglas County).  Mr. Hamilton's responsibilities as Clerk of the Court include:  issuing marriage licenses; requiring marriage license applicants to swear under oath to the information on their applications; collecting a tax on each marriage license; authorizing qualified ministers to perform marriage rites; filing, indexing and preserving completed marriage licenses; forwarding records of each marriage to the KDHE; and correcting and updating

marriage records.  Mr. Hamilton must ensure that he performs each of these functions in

compliance with all applicable Kansas laws, including the prohibition against same-sex

marriage.  Plaintiffs named Mr. Hamilton in his official capacity and alleged that he acted under

color of state law at all times relevant to this suit.

### 3.  Bernie Lumbreras

Defendant Bernie Lumbreras is the Clerk of the District Court for Kansas' Eighteenth

Judicial District (Sedgwick County).  Ms. Lumbreras holds the same position in Sedgwick

County as Mr. Hamilton holds in Douglas County, and is responsible for administering the same

marriage-related functions.  When she performs these functions, Ms. Lumbreras also must ensure

that each one complies with Kansas law, including its same-sex marriage ban.  Plaintiffs alleged

that the deputy clerk who denied Ms. Wilks and Ms. DiTrani's marriage license application

worked under the direction and supervision of Ms. Lumbreras.  They named Ms. Lumbreras in

her official capacity and alleged that she acted under color of state law at all times relevant to

this suit.

### D.  The Recognition Defendants

### 1.  KDOR Secretary Nick Jordan

Defendant Nick Jordan is the Secretary of the Kansas Department of Revenue.  Secretary

Jordan is responsible for "the direction and supervision" of the KDOR.  K.S.A. § 75-5101(a).

The KDOR includes a Division of Taxation, which operates under Secretary Jordan's

supervision.  As already explained, K.S.A. § 79-32,115 establishes rules governing the eligibility

of married couples to file married status income tax returns.  To clarify how this provision

applies to same-sex couples the KDOR issued Notice 13-18, entitled "Guidance for Same-Sex

Couples."  Doc. 85-1.  Notice 13-18 provides in relevant part:

> Kansas only recognizes marriages between one woman and one man. (See Article 15, Section 16, of the Kansas Constitution). [K.S.A. § 79-32,115] provides that a husband and wife shall file a joint or married filing separate return for income tax purposes. Individuals of the same sex cannot file a Kansas income tax return using a tax status of married filing jointly or married filing separately.

*Id.* The Notice also provided that married same-sex couples must complete a special worksheet if they filed their federal income tax return as "married." *Id.* By its terms, Notice 13-18 "applies to returns filed for tax year 2013 and going forward." Although the KDOR has removed Notice 13-18 from its website, plaintiffs assert that the Department continues to apply this statute to preclude same-sex couples from filing married status tax returns. Plaintiffs named Secretary Jordan in his official capacity and alleged that he acted under color of state law at all times relevant to this suit.

### 2. Lisa Kaspar

Defendant Lisa Kaspar currently serves as the Director of the KDV. The KDV is responsible for issuing driver's licenses to eligible Kansas residents and for reissuing driver's licenses to spouses who change their names during the marriage licensing process. *See* K.S.A. §§ 8-235(b) (governing issuance of new licenses), 8-246(a) (governing replacement of driver's licenses "if a new name is acquired"). Under K.S.A. § 23-2506(d), when a spouse seeks a new driver's license reflecting a martial name change, "[a]certified copy of a person's marriage license . . . shall constitute [sufficient] proof of identity." Plaintiffs allege that the KDV, under Director Kaspar's direction, has applied Kansas' same-sex marriage ban to deny same-sex couples the ability to get a new driver's license by furnishing a copy of their marriage license. Plaintiffs named Director Kaspar in her official capacity and alleged that she acted under color of state law at all times relevant to this suit.

15

### 3. Mike Michael

Defendant Mike Michael is the Director of Kansas' SEHP.  The SEHP provides health care benefits for state employees, their spouses, and any other eligible dependents.  Director Michael is responsible for implementing and administering the SEHP and for advising staff of various state employer institutions about the terms and benefits of the SEHP.  These duties include promulgating rules and guidance explaining who qualifies for SEHP coverage as an eligible dependent.

The SEHP's eligibility regulation provides that "[a]ny person enrolled in the health care benefits program as a primary participant may enroll the following [listed] dependents, subject to the same conditions and limitations that apply to the primary participant[.]"  K.A.R. § 108-1-1(g)(1).  One such eligible dependent is "[t]he primary participant's lawful wife or husband, as recognized by Kansas law and subject to the documentation requirements of the commission or its designee."  K.A.R. § 108-1-1(g)(1)(A).  Plaintiffs assert that Director Michael has applied and continues to apply the SEHP's dependent eligibility provision in a manner that excludes same-sex spouses from coverage.  Plaintiffs named Director Michael in his official capacity and alleged that he acted under color of state law at all times relevant to this suit.

## IV.  Defendants' Motions to Dismiss

Defendants collectively have filed four motions to dismiss plaintiffs' Amended Complaint (Docs. 57, 58, 79, and 120).  In one fashion or another, all of the arguments advanced in these motions challenge the Court's subject matter jurisdiction.  *See* Doc. 57 (asserting that the claims against Dr. Robert Moser and Secretary Mosier are barred by sovereign immunity, fail to present an Article III case or controversy, and are moot); Doc. 58-59 (asserting the same arguments as Secretary Mosier but also asserting that plaintiffs lack standing because they fail to

16

establish traceability and redressability of their injuries to the Clerks); Doc. 79 (asserting that the claims against Secretary Jordan, Director Kaspar, and Director Michael fail to present a federal question, and are barred by sovereign immunity, the Tax Injunction Act, and comity principles); Doc. 120 (asserting that the claims against all defendants are moot).

A party presents a challenge to a federal court's subject matter jurisdiction in a motion to dismiss under Rule 12(b)(1). *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1126 (10th Cir. 2010). A Rule 12(b)(1) motion may assert what is termed a facial jurisdictional challenge (*i.e.*, one based solely on the allegations presented in the complaint) or a factual jurisdictional challenge (*i.e.*, one based on evidence that goes beyond the complaint's allegations). *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). Defendants here have asserted both types of challenges.

When a court considers a facial attack, it must "must accept the [complaint's] allegations . . . as true." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). But where defendants present facts outside plaintiffs' complaint as support for their jurisdictional arguments, the Court must look beyond the complaint. *Id.* at 1003. And it may do so without converting a motion to dismiss into one for summary judgment.[4] *See id.* Nevertheless, when presented with a factual challenge to jurisdiction, the Court must resolve all factual disputes in favor of plaintiffs as the nonmoving party. *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996), *as amended* (Feb. 4, 1997).

Defendants have incorporated all the arguments they present in their motions to dismiss into their response opposing plaintiffs' motion for summary judgment. *See* Doc. 115 at 48.

---

[4] "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).

Instead of evaluating these arguments twice—once under the motion to dismiss standard and then a second time under the summary judgment standard—the Court will resolve these jurisdictional challenges under the summary judgment analysis.  This approach will simplify the analysis, allowing the Court to consolidate similar issues that defendants have raised numerous times in separate filings.  This approach also will benefit the defendants.  It evaluates their jurisdictional challenges under the standard applied to a party opposing summary judgment, a lighter burden than the one imposed on the proponent of a Rule 12(b)(1) motion.  *Compare Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (stating that on summary judgment, a court  "views the evidence and draws inferences in the light most favorable to . . . the non-moving party") *with Torres-Negron v. J & N Records, LLC*, 504 F.3d 151, 163 (1st Cir. 2007) (stating that a court should grant a Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law" (quotation omitted)).  As the Court explains below, even with the benefit of this more favorable summary judgment standard, defendants' various jurisdictional challenges do not warrant dismissal.  The Court thus denies each of defendants' four motions to dismiss.

## V.    Plaintiffs' Motions for Summary Judgment

Plaintiffs assert that they are entitled to summary judgment on all of their claims.  Below, the Court discusses the standard governing motions for summary judgment and applies it to the summary judgment facts and legal issues presented by this case.

### A.  Summary Judgment Standard

To prevail on a motion for summary judgment, plaintiffs must demonstrate that there is "no genuine dispute as to any material fact" and that they are "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When it applies this standard, the Court views the evidence and

draws inferences in the light most favorable to the non-moving parties—here, the defendants. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

Plaintiffs, as movants, bear "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)).  To meet this standard, plaintiffs need not negate defendants position; rather they must "simply point out to the [C]ourt a lack of evidence" on which a rational trier of fact could find for defendants.  *Samarah v. Danek Med., Inc.*, 70 F. Supp. 2d 1196, 1201 (D. Kan. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998))

If plaintiffs satisfy this initial burden, defendants "'may not rest on [their] pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which [they carry] the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248-49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler v. Wal-Mart Stores, Inc.*,

144 F.3d 664, 670 (10th Cir. 1998) (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## VI.   Threshold Issues

In defendants' four motions to dismiss and in many filings attendant to plaintiffs' motion for summary judgment, the parties have made several recurring arguments. Where possible, the Court has consolidated these arguments by the legal issues they present so it can discuss them efficiently.

### A.  Mootness

The mootness doctrine derives from "'[t]he constitutional case or controversy requirement of Article III . . ., as well as the prudential considerations underlying justiciability.'" *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) (quoting 15 James W. Moore & Martin H. Redish, *Moore's Federal Practice* § 101.90, at 101–237 (3d ed. 2010)). Courts therefore "recognize two kinds of mootness:  constitutional mootness and prudential mootness." *Rio Grande Silvery Minnow*, 601 F.3d at 1121. Throughout their four motions to dismiss and their response opposing summary judgment, defendants have raised many variations of arguments that assert, ultimately, the same thing:  plaintiffs' claims are moot. The Court, first, will review the record to determine whether plaintiffs' claims still present a live controversy sufficient to satisfy Article III's case or controversy requirement. Next, the Court will decide whether prudential factors nevertheless counsel against granting relief.

### 1.   Constitutional Mootness

"Constitutional mootness is grounded in the requirement that any case or dispute that is presented to a federal court be definite, concrete, and *amenable to specific relief*." *Jordan*, 654 F.3d at 1024 (internal quotation omitted).  This aspect of mootness focuses on whether "a definite controversy exists throughout the litigation and whether conclusive relief may still be conferred by the court despite the lapse of time and any change of circumstances that may have occurred since the commencement of the action."  *Id.*  It derives from Article III's case or controversy rule, which requires that "'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'"  *Rio Grande Silvery Minnow*, 601 F.3d at 1121 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)).

Courts frequently have described constitutional mootness as "'the doctrine of standing set in a time frame.'"  *Smith*, 110 F.3d at 727 (10th Cir. 1997) (quoting *Arizonans for Official English*, 520 U.S. at 67).  Although both the standing and mootness requirements present threshold jurisdictional issues, *see In re Yellow Cab Co-op. Ass'n*, 132 F.3d 591, 594 (10th Cir. 1997) (citations omitted), the doctrines impose separate burdens of proof.  The "plaintiff bears the burden of demonstrating standing, [while] the defendant bears the burden of proving mootness."  *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1183 (10th Cir. 2012) (citation omitted).

For clarity, the Court places defendants' mootness arguments into two categories:  (1) those presented by defendants' original three motions to dismiss and their summary judgment response (Docs. 57, 58, and 79); and (2) those presented by defendants' most recent motion to dismiss, which asserts that plaintiffs' claims are moot because Kansas officials voluntarily have complied with the rule established in *Obergefell*.

At least three separate times in their original, pre-*Obergefell* motions to dismiss, defendants asserted that the Court must dismiss plaintiffs' claims because they no longer are enforcing the challenged bans against licensing or recognition of same-sex marriages.  *See* Doc. 57 at 4-5 (arguing that plaintiffs' marriage-licensing claims are moot because the KDHE already uses gender neutral marriage-application forms); Doc. 59 at 5-10 (arguing that plaintiffs' marriage-licensing claims are moot because the Clerk defendants' judicial districts already license same-sex marriages); Doc. 115 at 42-44 (arguing that plaintiffs' marriage-licensing claims are moot because Secretary Mosier continues to issue the gender neutral marriage-application forms that her predecessor, Dr. Robert Moser, adopted).  Defendants also have repeated these mootness arguments throughout their filings but cloaked them in a surfeit of different labels.  *See* Doc. 59 at 6 (arguing that "sovereign immunity" applies because moot claims cannot constitute an "*ongoing* violation of federal law" under *Ex parte Young*; also asserting that plaintiffs lack "standing" for the same reason), 6-7 (arguing that no "Article III case or controversy" exists for the same reason), 7-11 (arguing that the case is "moot" for the same reason); Doc. 57 at 2-4 (arguing that the Court must dismiss the claims against Secretary Mosier because they are "moot," are barred by "sovereign immunity," and fail to establish a "case or controversy" for the same reason).  However labeled, none of these arguments are persuasive.

Conspicuously absent from defendants' pre-*Obergefell* representations that they already are providing plaintiffs the relief they seek is the reason *why* they are doing so.  But the reason both is evident and material to the analysis:  the preliminary injunction order issued in this case required defendants to do so.  This is apparent from the Administrative Orders issued by the Chief Judges of Kansas' Seventh and Eighteenth Judicial Districts.  These orders state explicitly

that the Chief Judges issued these orders to comply with this Court's preliminary injunction.  *See*
Doc. 59-1 at 3 ("In compliance with this preliminary injunction[,] this court . . . instructs the
Clerk . . . to issue marriage licenses to all qualified applicants without regard to the gender of
each applicant."); Doc. 59-3 ("The order of the United States Supreme Court [declining to stay
the Court's preliminary injunction order] directs the State of Kansas and parties to the *Kail*
*Marie* lawsuit to issue marriage licenses to same sex couples.").

Abating challenged activity pursuant to a court order moots a plaintiff's claims only if it
is "'absolutely clear,' absent the injunction, 'that the allegedly wrongful behavior could not
reasonably be expected to recur.'"  *Vitek v. Jones*, 445 U.S. 480, 487 (1980) (quoting *United*
*States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).  Defendants have not
made the requisite showing here.  Nor could they, because the injunction was just a preliminary
one.  "Compliance with the provisions of a preliminary injunction . . . does not render moot
[plaintiffs'] underlying claims" because "[i]f the injunction is dissolved without a decision on the
merits, there is nothing to keep defendants from resuming the activity that had been restrained by
the preliminary injunction."  *LaPeer Cnty. Med. Care Facility v. State of Mich.*, No. 1:91-CV-
333, 1992 WL 220917, at *7 (W.D. Mich. Feb. 4, 1992).  If the Court dismissed this case and
dissolved the preliminary injunction, the only basis to conclude that Kansas officials would not
resume enforcement of the same-sex marriage ban is defendants' assertion that they—on their
own accord—will comply with *Obergefell*.  The Court now turns to the merits of this argument.

Two weeks after the Supreme Court decided *Obergefell*, defendants filed another motion
to dismiss (Doc. 120).  It argued that plaintiffs' claims for declaratory relief are moot because
*Obergefell* already established the declaration plaintiffs seek here, Doc. 120 at 9, and that their
claims for injunctive relief are moot because Kansas officials are complying voluntarily with the

Supreme Court's ruling. *See id.* at 1-2. But as plaintiffs argue correctly, "While *Obergefell* is clearly controlling Supreme Court precedent," it "did not directly strike down the provisions of the Kansas Constitution and statutes that ban the issuance of same-sex marriage licenses and prohibit the recognition of same-sex marriages entered into in Kansas and elsewhere." Doc. 122 at 3; *see also Obergefell*, 2015 WL 2473451, at *6 (noting that the laws at issue in the case "come from Michigan, Kentucky, Ohio, and Tennessee"). So *Obergefell* did not rule on the Kansas plaintiffs' claims, and this conclusion leaves defendants with just one mootness argument—that defendants' voluntary compliance with *Obergefell* has rendered this case moot.

The standard for a party asserting mootness by voluntary compliance is a "stringent" one. *Friends of the Earth*, 528 U.S. at 189. Voluntarily halting the conduct challenged by the lawsuit moots a case only "'if subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Concentrated Phosphate Exp. Ass'n*, 393 U.S. at 203); *see also Adarand Constructors*, 528 U.S. at 222 (noting that this "heavy burden" lies with the party asserting mootness). Under this standard, defendants not only must establish that they are complying with the Constitution presently, but also that there is no reasonable risk of noncompliance in the future. *See Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir. 1997). This already-heavy burden "must be weighed against . . . the public interest in having the case decided" once and for all, *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1524 (10th Cir. 1992), which, in cases like this one, favors plaintiffs. *See Rio Grande Silvery Minnow*, 601 F.3d at 1137 (explaining that "'a public interest in having the legality of the practices settled[] militates against a mootness conclusion'") (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)). With this standard in mind, the Court evaluates the sufficiency of each defendant's mootness claim under the summary judgment standard.

#### i.   *Claims Against the Original Defendants*

The Clerk defendants assert that the licensing plaintiffs' claims are moot because they continue to issue same-sex marriage licenses, just as they have done now for more than seven months.  Doc. 120 at 2.  Secretary Mosier asserts that she continues to distribute marriage forms and administer marriage records in a manner recognizing same-sex marriage just as her predecessor did after the Court issued its preliminary injunction order.  But the original defendants have not supplemented the record with any new evidence to support their counsel's assertion of voluntary compliance.  They simply cite the pre-*Obergefell* declarations and Administrative Orders they submitted with their previous motion to dismiss.  *See* Doc. 120 at 5, 6-7 (citing Doc. 23-6, 59-1, 59-2 and 59-3).  This evidence just shows that these defendants have complied and continue to comply with the preliminary injunction issued in this case.  As the Court already has explained, such compliance does not moot a plaintiff's underlying claims.  *See supra*, pp. 22-23  If the defendant Clerks have evidence establishing that they are granting plaintiffs' requested relief for reasons independent of the preliminary injunction order, it is their duty to present it to the Court.  They have not done so, and the current record will not justify the conclusion that defendants have met their burden to show mootness based on voluntary compliance.

#### ii.   *Claims Against Secretary Jordan*

Secretary Jordan asserts that the KDOR has withdrawn Notice 13-18, the guidance document clarifying that the Department does not permit same-sex couples to file income tax returns as a married couple.  He also asserts that, in accordance with *Obergefell*, the KDOR will accept and process income tax returns submitted by same-sex married couples in the same manner as those submitted by opposite-sex married couples.  But the only evidence he has

submitted—an affidavit from Richard Cram, Director of Policy and Research for the KDOR—
fails to support his sweeping claim.  Doc. 120-1.  At best, Mr. Cram's affidavit establishes that
"Notice 13-18 has been removed from the [KDOR's] website and is no longer valid."  *Id.* at 2.
Contrary to Secretary Jordan's arguments, the affidavit provides no assurance that the KDOR
currently is treating same-sex married couples and opposite-sex married couples equally for tax
filing purposes, much less that it will do so in the future.

　　　　Plaintiffs have submitted the only evidence about whether the KDOR currently is
providing equal tax treatment to same-sex couples:  a declaration from Nolin Christensen, who
operates a tax preparation service in Wichita, Kansas and has helped same-sex couples file
Kansas income tax returns as married couples.  Doc. 122-1.  His declaration describes the
following exchange with the KDOR.

　　　　On Thursday, July 2, 2015—one week after *Obergefell* was decided— Mr. Christensen
sent an e-mail to the KDOR about the status of his clients' 2014 Kansas income tax returns.  *Id.*
at 1.  Bob Clelland, a representative from the Office of the Secretary of the KDOR, replied that
the "issue is under review by our attorneys because of the recent [S]upreme [C]ourt ruling, but at
this time [the clients' return] will not be accepted."  *Id.* at 6.  Eight days later, on Friday, July 10,
2015, Mr. Christensen sent a follow up email.  *Id.* at 5.  Mr. Clelland responded, "We are not
accepting joint returns yet, legal is reviewing it.  On this return, it was filed married filing joint, I
will have to change it to separate filing."  *Id.* at 4.  Three more days later, Mr. Christensen again
sent a follow up email, this time mentioning the very affidavit that Mr. Cram filed in this case.
*Id.* at 4.  In response, Mr. Clelland forwarded an email he had received from Mr. Cram himself.
It stated:

> The AG filed an affidavit signed by me stating that we had pulled Notice 13-18
> (our notice stating we do not recognize same sex marriages for state income tax

26

purposes) from our website as "no longer valid." However, we are still waiting to hear from the Governor's legal staff on exactly what that will mean, *i.e.*, can we now accept "married filing joint" returns from validly married same sex couples, and if so, for which tax years? I'm hoping we will hear something early this week.

*Id.* at 3. In short, Mr. Cram's affidavit fails to establish that the KDOR *currently* is processing married-status tax returns filed by same-sex couples on equal terms as those filed by opposite-sex couples. Consequently, the Court concludes that a live controversy still exists against Secretary Jordan.

### iii. Claims Against Director Kaspar

Director Kaspar asserts that plaintiffs' claims against her are moot because the KDV now permits same-sex spouses to get driver's licenses reflecting their married names. Doc. 120 at 8-9. In support, she submitted an affidavit in which she attests: "In full compliance with the U.S. Supreme Court's recent decision in *Obergefell*, issuance of a driver's license to a same-sex spouse now occurs in the same manner as it would for an opposite-sex spouse. KDOR policies are applied the same to both men and women, whether they are heterosexual couples or otherwise." Doc. 120-2 at 2. But Ms. Kaspar's affidavit does not address directly the relief plaintiffs seek, *i.e.*, the ability of same-sex spouses who changed their name when they married to obtain a Kansas driver's license under their new names.

Again, plaintiffs have submitted the only fact-based evidence about the current practices of the KDV: a declaration from Matt Lara, who entered a same-sex marriage this past May in Shawnee County, Kansas. Doc. 122-2. On July 10, 2015, Mr. Lara went to the KDV's driver's license office in Topeka, Kansas. *Id.* at 1. He asked to change the last name shown on his Kansas driver's license from Rinehart to his new married name, Lara. *Id.* The KDV denied his request. He was advised that the KDV had not updated its policies to accommodate same-sex spouses. *Id.* Later the same day, Mr. Lara called the KDV and spoke to a man named Chris,

who confirmed that the KDV could not issue a new driver's license in Mr. Lara's married name because the Division had not updated its policies. *Id.* at 3-4. On Monday, July 13, 2015, Mr. Lara received a telephone call from the KDV advising him that the Division would permit him to change his name on his Kansas driver's license. *Id.* at 4.

The evidence before the Court, even when viewed most favorably to Director Kaspar, reflects uncertainty whether the KDV currently permits same-sex spouses to obtain updated driver's licenses under their married name. Whatever KDV policy changes, if any, prompted Mr. Kaspar to declare on July 8, under oath, that "issuance of a driver's license to a same-sex spouse now occurs in the same manner as it would for an opposite-sex spouse," *see* Doc. 120-2 at 2, these policy revisions did not produce equal treatment for Mr. Lara two days later. Applying the mootness standard, the Court cannot conclude that Director Kaspar has established no risk of a recurring violation because, in fact, a violation occurred just two days after she signed her affidavit. *See Campbell*, 962 F.2d at 1524. The Court thus declines to dismiss the claims against Ms. Kaspar as constitutionally moot.

### *iv. Claims Against Director Michael*

Director Michael asserts that the claims against him now are moot for two reasons. First he claims that same-sex spouses already are eligible for dependent coverage under the SEHP because K.A.R. 108-1-1(g)(1) extends eligibility to "[t]he primary participant's lawful wife or husband, as recognized by Kansas law." This regulation must confer eligibility to same-sex spouses, he reasons, "because Kansas now recognizes same-sex marriage." *See* Doc. 120-8. But this regulation only asks—but does not answer—whether Kansas now recognizes same-sex marriages. And for the reasons discussed in this section, Director Michael's argument assumes an answer to this question that finds insufficient support in the record. The Court is not yet in a

position to conclude that K.A.R. 108-1-1(g)(1) has been altered to extend dependent coverage to same-sex spouses.

Director Michael also relies on the affidavit of Mike Randol, Director of Kansas Division of Health Care Finance, which states, "As of July 7, 2015, all state agencies have been directed to accept applications for health insurance coverage for same-sex spouses just as they accept applications for opposite-sex spouses." Doc. 120-3 at 2. As plaintiffs note, however, Mr. Randol's affidavit states only that agencies will "*accept*" such applications. It does not say that the SEHP will accept and approve them on the same terms that apply to opposite-sex spouses. It is possible, the Court recognizes, that Mr. Randol simply may have drafted his affidavit inartfully. But the mootness standard requires precise and certain assurances. *See Friends of the Earth*, 528 U.S. at 189. Mr. Randol's affidavit does not support a determination that no chance of recurring violation exists. *Cf. Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995) (noting that party opposing summary judgment only is entitled to "reasonable inferences" from the factual record). Because he has provided no evidence that the SEHP currently is approving same-sex spouses as eligible dependents on the same terms that it applies to opposite-sex spouses, the Court declines to dismiss the claims against Director Michael as moot.

In sum, the summary judgment facts reflect uncertainty whether the defendants currently are complying with *Obergefell*. But the record also suggests that defendants have taken some affirmative steps to accord the relief plaintiffs seek in this lawsuit. "To be sure, promises of reform or remedy aren't often sufficient to render a case moot as a constitutional matter." *Winzler*, 681 F.3d at 1210. "But even when the risk of recalcitrance is injury enough to keep the case alive as an Article III matter, it isn't necessarily enough to avoid the application of

prudential mootness doctrine." *Id.* at 1210-11.  Thus, below, the Court discusses the prudential

considerations attendant to plaintiffs' requests for injunctive and declaratory relief.

### 2.  Prudential Mootness

"Even if a case is not constitutionally moot, a court may dismiss the case under the

prudential-mootness doctrine if the case 'is so attenuated that considerations of prudence and

comity for coordinate branches of government counsel the court to stay its hand, and to withhold

relief it has the *power* to grant.'"  *Rio Grande Silvery Minnow*, 601 F.3d at 1121-22 (quoting

*Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997).  To put it another way,

"[p]rudential mootness addresses not the power to grant relief but[, instead,] the court's

discretion in the exercise of that power."  *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724,

727 (10th Cir. 1997) (internal quotation omitted).

The prudential aspect of the mootness doctrine "has particular applicability in cases, such

as this one, where the relief sought is an injunction against the government."  *Bldg. & Constr.*

*Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993).  Although the question

"[w]hether, when, and to what degree mootness can boast of being a constitutional command, a

true jurisdictional limit on the federal courts, has taxed great minds," *see Winzler*, 681 F.3d at

1210 (collecting cases and scholarly works), this much is certain:  "claims for equitable relief . . .

appeal to the 'remedial discretion' of the courts" and thus uniquely implicate the doctrine of

prudential mootness.  *Id.* (citing *Smith*, 110 F.3d at 727); *Rio Grande Silvery Minnow*, 601 F.3d

at 1122 ("All the cases in which the prudential mootness concept has been applied have involved

a request for prospective equitable relief by declaratory judgment or injunction.").  "This

remedial discretion necessarily includes the power to 'mould each decree to the necessities of the

particular case.'"  *Id.* (quoting *Hecht Co.*, 321 U.S. at 329).

The Court notes at the outset that a permanent injunction is an "extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  In general terms, principles of federalism and comity counsel a federal court to proceed cautiously when asked to enjoin the operation of a state governments.[5]  The relief requested by plaintiffs' does not directly offend any abstention doctrine.  *See* Doc. 29 at 18-26; *see also infra*, pp. 36-40.  But the comity and federalism principles that these doctrines embody counsel the Court to exercise caution when it decides whether to issue a permanent injunction against Kansas officials.

Prudential mootness considerations often arise when "a plaintiff starts off [a case] with a vital complaint but then," as here, the defendant "steps in to promise the relief [plaintiff] seeks." *Winzler*, 681 F.3d at 1210.  The weight a Court should give such an assurance "depends, of course, on who is making the promise and the reliability of that party's past promises." *Id.* at 1211.  A government's remedial commitments, like the ones Kansas officials have expressed here, "bear special gravity." *Cf. id* (applying this credibility rationale to a coordinate federal government branch).  Courts must take them seriously not "only because they are generally trustworthy," but because an injunction risks needless friction over the enforcement of the injunction and duplicative expenditure of finite public resources. *Id.*

With these considerations in mind, the Court turns to plaintiffs' request for injunctive relief.  The summary judgment record establishes that defendants have taken steps to comply with *Obergefell*.  As discussed, these measures, as presented in the summary judgment record,

---

[5] *See, e.g., R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941) (holding that federal courts should abstain from deciding cases presenting unsettled questions of state law); *Younger v. Harris*, 401 U.S. 37, 43 (1971) (describing the "longstanding public policy against federal court interference with state court proceedings"); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) (holding that federal courts should decline to interfere with complex state administrative procedures); 28 U.S.C. § 2283 (the "Anti-Injunction Act") (providing that "a court of the United States may not grant an injunction to stay proceedings in a State court . . . ); 28 U.S.C. § 1341 (the "Tax Injunction Act) (barring federal court interference with the "assessment, levy, or collection" of state taxes).

are insufficient to moot plaintiffs' claims as constitutional matter.  But they do reflect a deliberate—though perhaps incomplete—effort to comply with *Obergefell*.  In the Court's view, the prudent course of action is to let defendants finish updating their policies and practices to conform to *Obergefell*'s new rule of constitutional law.  The Court thus defers, for now, the portion of plaintiffs' summary judgment motion seeking injunctive relief.  Should subsequent events reveal that the Court's hopefulness about Kansas officials' pledge to comply with *Obergefell* is misplaced, plaintiffs may supplement their motion for summary judgment on their claims for injunctive relief in the manner described at the end of this Order.

This interim conclusion about injunctive relief, however, does not dispose of plaintiffs' claims for declaratory relief.  "[T]he mootness of a plaintiff's claim for *injunctive relief* is not necessarily dispositive [of] the mootness of his claim for a *declaratory judgment*."  *Jordan*, 654 F.3d at 1025.  Where a plaintiff seeks both an injunction and declaratory relief, the Court has a "duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of [an] injunction.'"  *Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 121 (1974) (internal quotation omitted).  "[I]t is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff."  *Rio Grande Silvery Minnow*, 601 F.3d at 1109-10 (internal quotation omitted).  "'The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world.'"  *Id.* at 1110 (quoting *Wyoming v. U.S. Dep't of Agric.,* 414 F.3d 1207, 1212 (10th Cir. 2005)).  The declaratory judgment must settle "some dispute which affects the behavior of *the defendant toward the plaintiff*."  *Id.* (internal quotation omitted).

Judged by these criteria, plaintiffs' claims remain appropriate for declaratory relief. As explained above, the summary judgment record establishes that defendants are taking steps to comply with *Obergefell*. While this fact counsels against issuance of injunctive relief, it favors issuance of declaratory relief. A declaratory judgment would provide the parties with a definitive ruling about the constitutionality of the Kansas laws, policies, and practices that plaintiffs have challenged in this lawsuit. It also would establish the constitutional criteria that defendants' updated policies or practices must meet. Under these circumstances, such a declaration will affect defendants conduct toward plaintiffs, *see Rio Grande Silvery Minnow*, 601 F.3d at 1110, making its issuance proper under the mootness standard. And it would accord plaintiffs' requested relief in a fashion that is more sensitive to principles of comity and federalism. *See Steffel v. Thompson*, 415 U.S. 452, 467 (1974) (noting that the purpose of the Declaratory Judgment Act was to provide a milder alternative to injunctions for testing the constitutionality of state statutes). Accordingly, the Court finds that post-*Obergefell* events have not mooted plaintiffs' claims for declaratory relief and those claims remain live and appropriate for adjudication. The Court thus proceeds to decide those claims.

## B. Proper Defendants

Secretary Mosier, Dr. Robert Moser, and the Clerk defendants have argued that they are not the proper defendants to grant plaintiffs the relief they seek.[6] The Court addresses the arguments asserted by each defendant, below.

---

[6] Director Kaspar and Secretary Jordan have suggested that they too are not proper parties in this litigation. *See e.g.*, Doc. 115 at 45 (arguing that "[d]efendants Kaspar and Jordan are also not proper defendants in this litigation, which can involve only the legal rights and grievances of these ten plaintiffs."). These two defendants do not develop this argument, however, other than saying that it is so. The Court declines to consider this assertion as grounds for dismissing Director Kaspar and Secretary Jordan because they have provided no legal or factual basis for their argument.

### 1.   Dr. Robert Moser and Secretary Mosier

Defendant Robert Moser moves to dismiss all claims against him.  The Court previously had concluded that Dr. Moser was a proper defendant in this lawsuit because his official duties as Secretary of the KDHE connected him sufficiently to the relief plaintiffs seek.  *See* Doc. 29 (discussing his office's marriage-related enabling and registration functions).  His current motion for dismissal relies principally on his resignation as Secretary of the KDHE.  After Dr. Moser resigned in November 2011, Susan Mosier, M.D., assumed the office as Interim Secretary of KDHE.

In this situation, Fed. R. Civ. P. 25(d) provides that "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending."  Rather, "[t]he officer's successor is automatically substituted as a party."  *Id.*  Automatic substitution of successor officials is proper where, as here, plaintiffs have asserted no claims against an official in his or individual capacity, and "effective relief would call for corrective behavior by the one [now] having official status and power, rather than one who has lost that status and power through ceasing to hold office."  Advisory Committee Notes, 1961 Amendment to Fed. R. Civ. P. 25(d)(1).  Thus, all claims, defenses, and motions against Dr. Moser survive as if the new KDHE Secretary, Susan Mosier, had been the original defendant in this case.[7]

Secretary Mosier has failed to persuade the Court to depart from its previous conclusion that the Secretary of the KDHE is a proper party in this litigation.  Her office supervises the registration of all marriages, *see* K.S.A. § 23-2507; supplies marriage certificate forms to district courts, *see* K.S.A. § 23-2509; maintains an index of marriage records and provides certified

---

[7] For this reason, the Court rejects Dr. Robert Moser's arguments relying on his resignation as Secretary of the KDHE.  Instead, the Court simply resolves them as if plaintiffs had asserted these claims against Secretary Mosier, the current acting Secretary of the KDHE.

copies of those records on request, copies which constitute prima facie evidence of valid marriages in "all courts and for all purposes."  K.S.A. § 23-2512.  The marriage-enabling and registration functions Secretary Mosier performs connect her sufficiently to the recognition relief sought by plaintiffs to justify her status as a defendant in this lawsuit.

### 2.   The Clerk Defendants

The Clerk defendants assert that judges, not clerks, make decisions about who may receive a marriage license.  Because plaintiffs have failed to join the Chief Judges of their districts—and cannot do so, the Clerks claim, under judicial immunity principles—the Court must dismiss plaintiffs' licensing claims for failure to join indispensable parties.  Doc. 59 at 11-12.  Although the Clerk defendants cite Fed. R. Civ. P. 19, they discuss none of the factors pertinent to a motion relying on this rule.  *See id.*; *see also Citizen Potawatomi Nation v. Norton*, 248 F. 3d 993, 1000 (10th Cir. 2001) (identifying factors).  The Clerks' argument, again, is mislabeled.  Its substance challenges whether plaintiffs' injuries are traceable to and redressable by the Clerks—an argument properly analyzed under the standing doctrine.

The Clerks first assert that the Chief Judges—not clerks—decide whether applicants are entitled to a marriage licenses.  This characterization conflicts with the power conferred on the Clerks by Kansas law.  It provides:  "The clerks of the district courts or judges thereof, when applied to for a marriage license by any person who is one of the parties to the proposed marriage and who is legally entitled to a marriage license, *shall* issue a marriage license."  K.S.A. § 23-2505.  Thus, under Kansas law, judges and clerks may issue marriage licenses.

At best, defendants' argument establishes that some other non-party actors may engage in similar conduct against same-sex marriage applicants.  But here, plaintiffs Marie, Brown, Wilks,

and DiTrani suffered their alleged constitutional injuries at the hands of the Clerks, not a judge.

As the Court explained in its preliminary injunction order:

> [P]laintiffs suffered an actual ("in fact") injury when the Clerks, acting on account of state law, refused to issue marriage licenses to plaintiffs.  Second, this injury is "fairly traceable" to Kansas' laws.  Chief Judge Fairchild's Administrative Order 14-13 explains why the license did not issue to plaintiffs Marie and Brown.  Likewise, the prepared statement read by the Sedgwick County deputy clerk reveals that Kansas' ban was the only reason the clerk refused to issue a license to plaintiffs Wilks and DiTrani.  And last, common logic establishes that the relief sought by plaintiffs, if granted, would redress plaintiffs' injuries.  The Clerks refused to issue licenses because of Kansas' same-sex marriage ban.  It stands to reason that enjoining enforcement of this ban would redress plaintiffs' injuries by removing the barrier to issuance of licenses.

Doc. 29 at 9.  Aside from relabeling their argument, defendants have identified no reason to depart from this prior holding.  The Court thus concludes that the Clerks are appropriate defendants for the licensing claims asserted by these plaintiffs.

## C. Eleventh Amendment Sovereign Immunity

The Eleventh Amendment bars suits brought by individuals against state officials acting in their official capacities.  *Harris v. Owens*, 264 F.3d 1282, 1289 (10th Cir. 2001).  However, under *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief."  *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012) (citations omitted).  Director Michael argues that the relief sought against the SEHP plan squarely implicates Eleventh Amendment sovereign immunity because, "in practical effect," it demands a monetary payment from the state.[8]  Doc. 79 at 9.

---

[8] As noted above, defendants have asserted arguments labeled "sovereign immunity" that, in substance, address other issues (*e.g.*, mootness, standing, the need to substitute parties).  *See* Doc. 57 at 2-3, Doc. 59 at 6; Doc. 79 at 8-10.  The Court addresses these arguments in the sections that correspond to their actual substance.  This section addresses the only argument raising genuine sovereign immunity issues, the one asserted by Director Michael.

But the mere possibility that a remedy incidentally may require a monetary payment from the state does not determine whether a claim is barred by the Eleventh Amendment. In *Edelman v. Jordan*, the Supreme Court confirmed that *Ex Parte Young* permits a federal court to order prospective injunctive relief, even if compliance will cost the state money. 415 U.S. 651 (1974). *Edelman* involved a claim asserting that the Illinois Department of Public Aid's methods for processing welfare applications failed to comply with federal requirements. *Id.* at 653. The *Edelman* plaintiffs sought two types of relief: (1) an injunction requiring the state to comply with federal requirements in the future; and (2) an injunction requiring the state to pay the plaintiffs all funds previously withheld improperly. *Id.* at 656-57. Although the requested injunction required payment of state funds, the Supreme Court concluded that the first category of relief was permissible under *Ex Parte Young*. *Id.* at 668. Such payments, it reasoned, were a "consequence of compliance in the future with a substantive federal-question determination." *Id.* The Court then concluded that the second category of relief violated *Ex Parte Young*, despite the plaintiffs' characterization of the remedy as "equitable restitution," because "it [was] in practical effect indistinguishable in many aspects from an award of damages against the State." *Id.*

Here, plaintiffs seek an order requiring Director Michael and the SEHP to "recognize the marriages of same-sex couples validly entered into in Kansas and elsewhere." Doc. 52 at 30. No aspect of this remedy requests a damage or damage-like award against Kansas. Indeed, plaintiffs say this explicitly in their briefs: "The Recognition Plaintiffs are not seeking any monetary payments for past tax overpayments or unpaid health insurance claims. They seek only prospective relief." Doc. 83 at 4. Had plaintiffs requested an award of damages, the Court would not grant it for the very reasons defendants have argued. But because plaintiffs' requested

injunction requires prospective compliance only, it falls within the type of remedy permitted by *Edelman*.  The Court thus declines to dismiss the claims against Director Michael.

### D.  The Tax Injunction Act

Secretary Jordan asserts that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, deprives this Court of subject matter jurisdiction to hear plaintiffs Peters and Mohrman's claim seeking equal recognition of same-sex marriages under Kansas' tax laws.  Passed in 1937, the TIA provides that "[t]he District Court shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  *Id.*  The Supreme Court has interpreted the TIA to create a jurisdictional bar to federal court interference with the collection of state taxes.  *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 470 (1976).  The barrier it imposes is construed broadly "[i]n light of the Act's overarching purpose to impede federal court interference with state tax systems."  *Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666, 670 (11th Cir.) *opinion clarified*, 742 F.2d 590 (11th Cir. 1984).  The TIA applies both to lawsuits seeking injunctive relief and declaratory relief.  *See California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982).  Secretary Jordan argues that plaintiffs' claims ask the Court to do precisely what the act forbids:  "enjoin, suspend, or restrain" the assessment of a tax under state law.

Secretary Jordan's argument under the TIA requires the Court to decide, first, whether the injunction implicates an "assessment, levy or collection" of a state tax.  Under the TIA, courts have interpreted the operative phrase of the TIA, "tax under State law," to mean "state laws that are intended to raise revenue."  *Id.* (citing *Schneider Transp., Inc. v. Cattanach*, 657 F.2d 128, 132 (7th Cir. 1981) (further citations omitted)).  "[T]o the extent the statute challenged

is regulatory rather than revenue raising in purpose, the measure does not constitute a tax." *Id.* In other words, if the primary purpose of the challenged law is to "regulate behavior" rather than to raise revenue, "the provision is not a 'tax,' under the Tax Injunction Act." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 763 (10th Cir. 2010). Typically, federal courts must make this distinction when deciding whether registration fees, license fees, special improvement assessments, and the like exist "for revenue raising purposes or merely [are] a regulatory or punitive levy in the nature of a privilege fee." *Wright v. McClain*, 835 F.2d 143, 145 (6th Cir. 1987) (collecting cases); *see also* Erwin Chemerinsky, *Federal Jurisdiction* 785 (6th ed. 2012). Here, plaintiffs challenge no fee or assessment; rather, they challenge an aspect of Kansas' practices for administering and processing income tax filings.

Reviewing the purposes behind Kansas laws permitting married income tax filings reveals that they are regulatory in nature. In *Peden v. State*, 930 P.2d 1 (Kan. 1996), the Kansas Supreme Court considered an equal protection challenge to the KDOR's policy of treating single taxpayers and married taxpayers filing jointly differently. The equal protection challenge required the State to proffer legitimate state interests advanced by its preferential treatment of married taxpayers filing jointly. *Id.* at 13. The State of Kansas identified four goals advanced by it policy: "the encouragement of marriage, an alleviation of the increased financial burden placed on married taxpayers, an alleviation of the 'marriage penalty' under the federal income tax law, and the encouragement of tax filers who can file one joint return to do so." *Id.* at 14-15. Significantly, none of the purposes proffered by the State were revenue-based ones. To the contrary, all were purposes seeking to "regulate behavior," *see Edmondson*, 594 F.3d at 763, by

"encourage[ing] taxpayers to marry and stay married." *Peden*, 930 P.2d at 18.  Thus, the policy

challenged by plaintiffs here does not constitute a "tax" under the TIA.[9]

Nor does the risk that plaintiffs' requested remedy might incidentally affect some aspects

of state tax administration trigger the TIA's jurisdictional bar.  *See Hibbs v. Winn*, 542 U.S. 88,

105-06 (2004) (rejecting the notion that the TIA "immunizes from lower federal-court review all

aspects of state tax administration and not just interference with the collection of revenue"

(internal quotation marks omitted)).  The Court thus rejects Secretary Jordan's argument that the

TIA deprives this of Court of subject matter jurisdiction over plaintiffs' claims against him.[10]

## VII.   Analysis of the Merits of Plaintiffs' Claims

Having concluded that injunctive relief is not currently appropriate on the summary

judgment record before the Court and having rejected the remaining procedural and jurisdictional

challenges asserted by defendants, the Court now is prepared to rule the merits of plaintiffs'

motion for summary judgment on their claims for declaratory relief.  This is a straightforward

task.  The parties do not dispute any issues of fact that are material to the substantive merits of

this case.  The Supreme Court has held that state laws prohibiting the licensing or recognition of

same-sex marriages contravene the due process and equal protection clauses of the Fourteenth

Amendment:

---

[9] The Court's conclusion that plaintiffs' remedy does not implicate a state tax also resolves Secretary Jordan's similar argument that comity principles preclude the Court from adjudicating the claim against him.  *See* Doc. 79 at 19-21 (citing *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100 (1981))

[10] The decisions of other federal courts, including the Tenth Circuit, support the Court's conclusion that the TIA does not deprive it of jurisdiction to adjudicate plaintiffs' claims against the KDOR.  These courts—without mentioning the TIA—have concluded such claims are within the proper scope of federal lawsuits seeking recognition of same-sex marriages.  *See Bishop v. Smith*, 760 F.3d 1070, 1091 (10th Cir.) (suggesting that recognition plaintiffs could have established standing by suing members of the Oklahoma Tax Commission over denial of joint tax return filing status); *Baskin v. Bogan*, 2014 WL 2884868, at *4 (S.D. Ind. 2014) (granting summary judgment for plaintiffs and ordering the Commissioner of the Indiana Department of Revenue to permit same-sex married couples to file joint tax returns), *aff'd*, 766 F.3d 648 (7th Cir. 2014).

> The Court now holds that same-sex couples may exercise the fundamental right to marry.  No longer may this liberty be denied to them. . . . [T]he State laws challenged by Petitioners in these cases are now held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples.

*Obergefell*, 2015 WL 2473451, at *19.  *Obergefell*'s holding entitles plaintiffs to the declaratory relief they seek in this lawsuit.  The Court thus grants plaintiffs' motion for summary judgment on their claims for declaratory relief.

The Court hereby declares that Article 15, § 16 of the Kansas Constitution, K.S.A. § 23-2501, K.S.A. § 23-2508, and any other Kansas statute, law, policy, or practice that prohibits issuing marriage licenses to same-sex couples in Kansas or recognizing such marriages on the same terms and conditions that apply to opposite-sex couples contravene the Fourteenth Amendment to the United States Constitution.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Robert Moser's Motion to Dismiss Amended Complaint (Doc. 57), Douglas Hamilton and Bernie Lubreras' Motion to Dismiss Amended Complaint (Doc. 58), and Nick Jordan, Lisa Kaspar, and Mike Michael's Motion to Dismiss for Failure to State a Claim (Doc. 79), and defendants' joint Motion to Dismiss (Doc. 120) are denied.  Plaintiffs' Motion for Summary Judgment (Doc. 85) is granted in part.  The Court grants plaintiffs' motion for summary judgment on the claims seeking declaratory relief but defers its ruling on plaintiffs' claims seeking injunctive relief.

**IT IS FURTHER ORDERED BY THE COURT THAT** Article 15, § 16 of the Kansas Constitution, K.S.A. § 23-2501, K.S.A. § 23-2508, and any other Kansas statute, law, policy, or practice that prohibits issuing marriage licenses to same-sex couples in Kansas or recognizing such marriages on the same terms and conditions that apply to opposite-sex couples are hereby declared void and in contravention of the Fourteenth Amendment to the United States Constitution.

Specifically, the Court declares that the following conduct by defendants violates the Fourteenth Amendment to the United States Constitution:

1. the Clerk defendants, their officers, agents, and employees' policy of refusing to license same-sex marriages on the same terms that apply to opposite-sex marriages;

2. Secretary Mosier, her officers, agents, and employees' policy of refusing to distribute marriage-related forms and administer marriage records in a manner recognizing valid same-sex marriages solemnized in Kansas and elsewhere;

3. Secretary Jordan, his officers, agents, and employees' policies of:

   a. refusing to allow same-sex married couples to file married status income tax returns; and

   b. refusing to process tax filings by same-sex couples on the same terms that the KDOR applies to opposite-sex married couples;

4. Director Kaspar, her officers, agents, and employees' policy of refusing to permit same-sex spouses to obtain driver's licenses in their married through the same procedures that the KDV makes available to opposite-sex souses;

5. Director Michael, his officers, agents, and employees' policy of refusing accept and approve applications by same-sex spouses for dependent health care benefits under the SEHP on the same terms that apply to opposite-sex spouses.

**IT IS FURTHER ORDERED BY THE COURT THAT** should circumstances require the parties to supplement the undisputed facts material to plaintiffs' motion for summary judgment on their claims for injunctive relief, the parties must do so by September 15, 2015. Each side will have 21 days to respond or reply to any statement submitted by the other.

**IT IS SO ORDERED.**

**Dated this 10th day of August, 2015, at Topeka, Kansas.**

                                        **s/ Daniel D. Crabtree**
                                        **Daniel D. Crabtree**
                                        **United States District Judge**