### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

KAIL MARIE, et al.,

        Plaintiffs,

v.

SUSAN MOSIER, M.D., in her official
capacity as Secretary of the Kansas
Department of Health and Environment,
et al.,

        Defendants.

Case No. 14-cv-02518-DDC-TJJ

## MEMORANDUM AND ORDER RULING ON PLAINTIFFS' REQUEST FOR PERMANENT INJUNCTION

In an earlier Order, the court decided to defer the decision whether to grant plaintiffs'

request for permanent injunctive relief. *See* Doc. 126 at 32. The court now has considered the

parties' additional submissions and is prepared to rule on that issue. For reasons explained in

this Order, the court grants permanent injunctive relief.

## I.    BACKGROUND

### A.  PROCEDURAL HISTORY

Plaintiffs brought this action in October 2014 seeking injunctive and declaratory relief

under 42 U.S.C. § 1983. Plaintiffs asked the court to declare unconstitutional provisions in

Kansas law that prohibited plaintiffs and other same-sex couples from marrying. And plaintiffs

asked the court to enjoin defendants permanently from enforcing those laws "and any other

sources of state law to exclude same-sex couples from marriage." Doc. 1 at 19.

On November 4, 2014, the court granted plaintiffs' motion for a preliminary injunction.[1] This injunction forbade defendants from enforcing Kansas' laws prohibiting issuance of marriage licenses to same-sex couples, applying controlling precedent adopted by our Circuit and applied to similar state laws in Utah and Oklahoma.[2]  This precedent had held that Utah and Oklahoma's laws banning same-sex marriage violated the Constitution of the United States.

Six months after this court preliminarily enjoined enforcement of the challenged Kansas laws, the Supreme Court decided to hear a consolidated appeal arising from challenges to similar same-sex marriage laws in Ohio, Michigan, Kentucky, and Tennessee.  The Sixth Circuit had reached the opposite conclusion as the Tenth Circuit, holding that state laws banning same-sex marriages did not violate the Constitution.[3]  And on June 26, 2015, in a case called *Obergefell v. Hodges*,[4] the Supreme Court resolved these conflicting results.  It held that state laws banning same-sex marriage violate the Constitution's due process and equal protection clauses.

After *Obergefell* was decided, defendants argued that this case was moot and asked the court to dismiss it.  Plaintiffs disagreed and moved for summary judgment, asking the court to declare that Kansas' same-sex marriage laws (and related policies) violate the Constitution and thus are void.  Plaintiffs also asked the court to issue a permanent injunction forbidding defendants (and their successors) from ever enforcing these invalid laws.  The court concluded that *Obergefell*'s holding did not directly decide the claims in this case.  And so, the court applied *Obergefell*'s rule to the Kansas laws and decided whether they also offended the Constitution.

---

[1] Doc. 29 (Memorandum and Order of Nov. 4, 2014).

[2] *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014); *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014).

[3] *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014).

[4] 135 S. Ct. 2584, 2608 (2015).

In a Memorandum and Order issued on August 10 of last year, the court held that *Obergefell*'s rule rendered the Kansas laws equally invalid, and the court granted part of the relief that plaintiffs sought in their Amended Complaint and pending Motion for Summary Judgment.  Namely, the August 10 Order issued a declaratory judgment ruling that certain specified Kansas laws[5] contravened the Fourteenth Amendment to the United States Constitution.  It also extended this declaratory judgment to reach "any other Kansas statute, law, policy, or practice that prohibits issuing marriage licenses to same-sex couples in Kansas or [otherwise] recognizing such marriages on the same terms and conditions that apply to opposite-sex couples . . . ."  Doc. 126 at 41 (Memorandum and Order of August 10, 2015).

But when it issued this declaratory judgment, the court stopped short of granting plaintiffs all relief they sought.  Exercising its discretion under a line of cases known as the prudential mootness doctrine, the court decided to "'stay its hand, and to withhold'"—for the time being— "'relief [that] it ha[d] the power to grant.'"  Doc. 126 at 30 (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121–22 (10th Cir. 2010) (internal quotation and citation omitted)).  The court elected to postpone its ruling on plaintiffs' request for a permanent injunction forbidding defendants from enforcing the unconstitutional laws.  As the court explained at the time, the prudential mootness doctrine counsels federal courts to extend careful consideration to cases "'such as this one, where the relief sought is an injunction against the government.'"  Doc. 126 at 30 (quoting *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (citing *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993) (further citation omitted))).

---

[5] *I.e.*, Kan. Const. art. 15, § 16 of the Kansas Constitution, Kan. Stat. Ann. § 23-2501, and Kan. Stat. Ann. §23-2508.

The court decided to defer the permanent injunction issue because of remedial commitments defendants had made.  In short, defendants' counsel assured the court that defendants already had taken steps to comply with *Obergefell*.  Defendants' agents also assured the court that the state agencies led by defendants would continue to comply in the future.  And, correspondingly, the summary judgment record established that defendants had taken some meaningful, albeit imperfect steps to implement the changes required by *Obergefell*'s mandate. *See* Doc. 126 at 31–32; *see also* Doc. 120 at 10 ("It is uncontroverted that [p]laintiffs now can get marriage licenses . . . on the same terms and conditions as any other couple"); Doc. 120-1 at ¶ 3 (affidavit stating that the Kansas Department of Revenue had removed from its website the Notice stating that same-sex marriages are not recognized for income tax purposes and conceding that this Notice is no longer valid); Doc. 124-1 at ¶ 3 (affidavit stating that the Kansas Department of Revenue "is accepting tax returns for same sex married taxpayers for tax years 2014 and thereafter"); Doc. 120-2 at ¶ 3 (affidavit stating that the Kansas Division of Vehicles is "[i]n full compliance with . . . *Obergefell*" and the "issuance of a driver's license to a same-sex spouse now occurs in the same manner as it would for an opposite-sex spouse"); Doc. 120-3 (affidavit stating that "all state agencies have been directed to accept applications for health insurance coverage for same-sex spouses just as they accept applications for opposite-sex spouses").

Some remedial commitments "bear special gravity," depending, "of course, on who is making the promise[s] and the reliability of that party's past promises."  *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1211 (10th Cir. 2012).  So, the court decided to wait and see whether the Kansas officials sued in this case abided by their remedial assurances.  Consistent with this approach, the court authorized the parties to supplement the record with additional

undisputed facts material to its final decision whether to issue, or withhold, a permanent injunction.  The court also established deadlines for such submissions and authorized a response to the other side's supplemental submission.  As explained below, the parties availed themselves of these opportunities and made several additional rounds of submissions that the court had not requested.

**B.  ADDITIONAL SUBMISSIONS AND RESPONSES ADDRESSING COMPLIANCE WITH *OBERGEFELL* AND THE NEED FOR PERMANENT INJUNCTIVE RELIEF**

On September 14 and 15, 2015, defendants provided additional submissions to show their compliance with *Obergefell*.  *See* Docs. 129, 130.  Defendants/Clerks Hamilton and Lumbreras submitted administrative orders from judges in eight judicial districts directing clerks to issue marriage licenses to qualified same-sex couples.  Docs. 129-1, 129-2, 129-3.  They also submitted amendments made to the Supreme Court of the State of Kansas' Rules to reflect a uniform marriage license application.  Doc. 129-4.  And they submitted declarations declaring that their offices are issuing marriage licenses to all qualified applicants, including same-sex couples.  Docs. 129-5, 129-6.[6]

Defendants Mosier, Jordan, Kaspar, and Michael submitted four affidavits.  In one of them, Mr. Keck, the Deputy Chief Counsel of the Kansas Department of Health and Environment ("KDHE"), asserts that new marriage license forms were distributed to Kansas district court clerks and they provide choices of "spouse" and "parent" to accommodate same-sex marriage applicants.  Doc. 130-1 at 2.  And, Mr. Keck confirms that the officials responsible for marriage-related functions were directed to comply with *Obergefell*.  Doc. 130-1 at 2.  Mr. Michael, the Director of the Kansas State Employee Health Benefits Plan, asserts that "all state

---

[6] 28 U.S.C. § 1746(2) provides for a declaration subscribed to "under penalty of perjury" to have the same "force and effect" as a "sworn declaration, verification, certificate, statement, oath, or affidavit."  The declarations filed by Mr. Hamilton and Ms. Lumbreras were subscribed to "under penalty of perjury."

agencies have been directed to accept applications for health insurance coverage for same-sex spouses . . . ."  Doc. 130-2 at 2.  Ms. Kaspar, the Director of the Division of Vehicles for the Kansas Department of Revenue, declares that "[d]river's licenses are being issued to all applicants under the same terms and conditions whether they are parties to a same-sex marriage or otherwise."  Doc. 130-3 at 2.  The Director of Taxation for the Kansas Department of Revenue, Mr. Stotts, asserts that "same sex married couples are now treated the same as opposite sex married couples for state taxation purposes" to comply with *Obergefell*.  Doc. 130-4 at 2.

Plaintiffs took a different approach.  They chose not to submit any materials on the first deadline.  Instead, on the deadline for responding to defendants' submissions, they submitted three declarations that they characterized as a "response to Defendants' evidence regarding the need for injunctive relief."  *See* Doc. 131 at 1.  In their response, plaintiffs assert that the KDHE still is not complying with *Obergefell* completely.  Specifically, plaintiffs claim that the KDHE's Office of Vital Statistics continued to treat same-sex married couples who give birth through assisted reproduction differently than it treats such opposite-sex married couples.  Three declarations, described below, supported this assertion.

Christa Gosner and Carrie Hunt were married in Canada in 2007.  Ms. Hunt recently gave birth to twins through artificial insemination.  Their declarations explain that when Ms. Hunt gave birth to their twins at the University of Kansas Medical Center, Ms. Gosner could not be listed as a parent on the birth certificate.  *See* Docs. 131-1 at 1; 131-2 at 1.  The software used at the hospital "only has an option for entering a mother and a father and is unable to accommodate a same-sex spouse/parent."  Doc. 131-1 at 1.  So, Ms. Gosner reports, she called the KDHE Office of Vital Statistics to secure an amended birth certificate listing her as a parent of the newborns.  The KDHE informed Ms. Gosner that she "could not be listed as a parent" and

"would have to obtain a second parent adoption in order to be listed as a parent on [the] children's birth certificates." Doc. 131-1 at 2.

Casey Falmer Smith and her same-sex spouse had a similar experience. *See* Doc. 131-3. When Ms. Falmer Smith gave birth to the couple's child at Shawnee Mission Medical Center, her wife, Jessica Smith, also could not be listed on the birth certificate at the hospital. *Id.* at 1. And Ms. Falmer Smith declared that the KDHE Office of Vital Statistics "refused to recognize [her spouse] Jessica [Smith] as a parent . . . and insist[ed] that Jessica complete a step-parent adoption" before her name would be added to the birth certificate. *Id.* at 2. After the KDHE took this position, the Smiths initiated a legal proceeding in the District Court of Douglas County, Kansas to determine the child's parentage. And, Ms. Falmer Smith declares, "District Judge Sally Pokorny entered an Emergency Order Determining Parentage, in which the [c]ourt determined that Jessica [Smith] is a parent . . . under Kansas law." *Id.* But even after Judge Pokorny's Emergency Order, Ms. Falmer Smith asserts, the KDHE still refused to recognize Ms. Jessica Smith's parentage. *Id.* at 3. The Smith's attorney thus filed a motion in the state court action seeking to join the KDHE Office of Vital Statics and Ms. Mosier as necessary parties. *Id.*

Plaintiffs contend that these submissions show why permanent injunctive relief is appropriate. Defendants fervently disagree. They have filed an Objection and Response to Plaintiffs' Additional Submissions (Doc. 132), which placed three more items into the summary judgment record. *See* Docs. 132-3; 132-4; 132-5. Plaintiffs made one more submission (Doc. 133)—a filing they termed a "Response" to defendants' response. This filing added one more declaration to the record. *See* Doc. 133-1. The court addresses these responses and the arguments that the parties make based on them in its analysis, below.

Finally, the parties submitted three last items to the court in February and April 2016. First, plaintiffs filed a Notice of Supplemental Authority under our D. Kan. Rule 7.1(f).  *See* Doc. 135.  This Notice called the court's attention to *Waters v. Ricketts*, __ F. Supp. 3d ___, No. 8:14CV356, 2016 WL 447837 (D. Neb. Feb. 4, 2016), a decision from the federal court in Nebraska.  The court in *Waters* decided to issue a permanent injunction following a post-*Obergefell* remand from the Eighth Circuit.[7]  This injunction permanently banned enforcement of Nebraska's law against same-sex marriage.  It also ordered "all relevant state officials" to treat "same-sex couples the same as different-sex couples in the context of processing a marriage license or determining the rights, protections, obligations or benefits of marriage[.]"  *Waters*, 2016 WL 447837, at *6.

Defendants responded to plaintiffs' Rule 7.1 submission with one of their own.  *See* Doc. 136.  Among other things, defendants' submission argued that:  (1) this court has "den[ied] Plaintiffs' request for permanent injunctive relief as Plaintiffs failed . . . to make the required evidentiary showings on summary judgment;" and (2) an injunction "that encompasses Article 15, § 16 [of the Kansas Constitution] in its entirety would cause irreparable harm to the State and its citizens by prohibiting enforcement of its Constitution in ways neither challenged nor decided here."  Doc. 136 at 1.  Last, in April 2016, defendants filed another Notice of Supplemental Authority.  *See* Doc. 137.  Defendants assert in this Notice that a recent Tenth Circuit decision,

---

[7] The Eighth Circuit had found that Nebraska's assurances of compliance with *Obergefell* did not moot the case and directed the district court to determine the necessity of permanent injunctive relief after considering Nebraska's assurances and actions.  *Waters v. Ricketts*, 798 F.3d 682, 686 (8th Cir. 2015).

*Brown v. Buhman*, No. 14-4117, 2016 WL 1399358 (10th Cir. Apr. 11, 2016),[8] renders this case moot.

These materials frame the issues that are the principal focus of this Order. First, does the Circuit's decision in *Brown* require a different mootness conclusion than the one reached in the August 10 Order? To recall, the August 10 Order closely examined the constitutional mootness question and held that *Obergefell* did not render the claims in this case moot. *See* Doc. 126 at 23–29, 32–33. In part II, below, the court reanalyzes that question in light of the *Brown* decision. Next, and because the court concludes that the case is not moot, the court will analyze the prudential mootness considerations and rule on plaintiffs' request for a permanent injunction. Part IV of this Order contains that analysis.

## II.    REEXAMINATION OF CONSTITUTIONAL MOOTNESS

Defendants' Notice of Supplemental Authority contends that *Brown* alters the constitutional mootness analysis that the court applied in its August 10 Order. *See* Doc. 137 at 1. Though they have not formally asked the court to reconsider its August 10 Order, defendants' Notice argues that "*Brown* confirms [d]efendants' suggestion of what is appropriate here: dismissal on grounds of mootness, lack of standing, and lack of case or controversy . . . and vacatur of all prior judgments." *Id.* at 1. As explained below, the court concludes that *Brown* does not require the court to vacate its August 10 decision.

In *Brown v. Buhman*, the Tenth Circuit considered an appeal from a decision holding portions of Utah's bigamy statute unconstitutional. 2016 WL 2848510, at *1, *6. The Browns are a plural family, where Mr. Brown is legally married to one wife and "spiritually married" to three other "sister wives." *Id.* at *2. When a reality television show featured the Brown family,

---

[8] The Tenth Circuit later amended this opinion on May 13, 2016, and the court thus considers the amended opinion. *See Brown v. Buhman*, 822 F.3d 1151, No. 14-4117, 2016 WL 2848510 (10th Cir. May 13, 2016).

the Lehi, Utah Police Department opened an investigation of them under Utah's statute making

bigamy a felony. *Id.* Because the Browns feared prosecution under the statute, they moved to

Nevada in January 2011. *Id.* Then, in July 2011, they filed suit in the Utah federal district court

asserting that the bigamy statute infringed on their First and Fourteenth Amendment rights. *Id.*

at *2–3. In their complaint, plaintiffs sued the Governor and Attorney General of the State of

Utah and the Utah County Attorney, and they asked for declaratory relief and preliminary and

permanent injunctions against the statute's enforcement. *Id.* at *3.

The defendants filed motions to dismiss, and the County Attorney defendant submitted a

declaration supporting his dismissal motion. *Id.* at *4–5. It asserted that, though no one on his

staff could recall ever prosecuting someone for polygamy, the office did not have a formal policy

guiding when it would prosecute under this statute. The declaration also explained that the

County Attorney occasionally had prosecuted bigamy when presented with marriage fraud or a

failure to get divorced before remarrying. *Id.* at *4. And the County Attorney also declared that

"[w]ere the Browns committing other crimes, such as spousal or child abuse, welfare fraud or the

like . . . the chance of prosecution would be likely." *Id.* (internal quotation marks omitted).

Essentially, because the Utah County Attorney's Office did not have an "official prosecution

policy," the district court concluded that the Browns still faced "a credible threat of prosecution

. . . and therefore had standing to bring their claims" against the Utah County Attorney. *Id.* at *5

(internal quotation marks omitted).

But later, the Utah County Attorney adopted a formal policy. It provided that the

County Attorney would prosecute persons for bigamy only when (1) a victim is induced to marry

through the person's fraud or misrepresentation; or (2) the person also is engaged in some type of

abuse, violence, or fraud. *Id.* The Utah County Attorney submitted a second declaration to the

district court informing it of this policy change.  This time, the County Attorney declared that he no longer intended to prosecute bigamous marriages entered into for religious reasons.  *Id.*  He asserted that his office had closed its investigation of the Browns and did not intend to charge them under the bigamy statute because the investigation had concluded that the Browns had committed no other crimes related to the bigamy allegation.  *Id.*  On this basis, the County Attorney again moved to dismiss the Browns' case against him on mootness grounds.  *Id.*

The district court denied his motion.  *Id.* at *6.  It found that the County Attorney had adopted the new policy strategically, just to render the case moot.  *Id.*  And the district court found that the policy was "an exercise of prosecutorial discretion that could easily be reversed in the future by a successor [ ] County Attorney."  *Id.* at *18.  The district court thus held that the case was not constitutionally moot because "it could not conclude that there is no reasonable expectation that [the Browns] would be prosecuted under the statute in the future."  *Id.* at *6 (internal quotation marks and citation omitted).  Turning to prudential mootness considerations, the district court concluded the case was not moot because the County Attorney's Office appeared to have adopted the policy to evade review of the Browns' claims, and not to provide a remedy to the Browns.  *Id.*  The district court thus proceeded with the case and ultimately granted declaratory relief on summary judgment.  But it did not order injunctive relief.  *Id.* at *7.

On appeal, the Tenth Circuit held that the district court had erred by proceeding to the merits of the Browns' claims and, instead, should have granted the Utah County Attorney's second motion to dismiss the case as moot.  *Id.*  The Circuit held that, once the Utah County Attorney's Office adopted the new policy, there was no longer a live dispute between the parties that the district court had the power to decide.  And so, the district court lacked jurisdiction.  *Id.* The Tenth Circuit explained:

> A suit becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.  No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.  The crucial question is whether granting a present determination of the issues offered will have some effect in the real world.  Put another way, a case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision.

*Id.* at *10 (internal quotation marks and citations omitted).  The Circuit also recognized that two exceptions to the mootness doctrine exist:  (1) disputes that are capable of repetition, yet evading review and (2) voluntary cessation.  *Id.* at *10–11.  Relevant in *Brown* and in this case is the second exception.

Voluntary cessation of the defendant's conduct does not render a case moot when the challenged conduct could resume after the case is dismissed.  *Id.* at *11.  But, voluntary cessation may moot a case "if the defendant carries the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (internal quotation marks and citation omitted).  While a heavy burden, courts generally deny mootness on this ground where government officials are involved only when there are "'*clear showings* of reluctant submission [by government actors] and a desire to return to the old ways.'"  *Id.* (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010)).  Indeed, "government 'self-correction . . . provides a secure foundation for mootness so long as it seems genuine.'"  *Id.* (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1118 (further quotation omitted)).  When reviewing for mootness based on voluntary cessation, courts must conduct a factual inquiry to "assess the likelihood that defendants will recommence the challenged, allegedly offensive conduct."  *Id.* at *12 (internal quotation marks and citation omitted).

The Tenth Circuit's analysis in *Brown* examined whether one reasonably could expect the County Attorney's allegedly unconstitutional conduct to recur following his declaration of a formal policy change, and thus providing a basis for a voluntary cessation exception to mootness. *Id.* It concluded that the County Attorney's "declaration and the Browns' move to Nevada eliminated any reasonable expectation that the Browns will be prosecuted," so the district court lacked authority to "enjoin future alleged constitutional violations." *Id. Brown* was moot, and the voluntary cessation exception did not displace the mootness conclusion. *Id.*

Specifically, though the County Attorney may have adopted the formal policy in reaction to the Browns' suit, the court determined that the County Attorney would follow the policy, especially because he had publicly adopted it under penalty of perjury. *Id.* at *14. The likelihood of the County Attorney's Office revoking or ignoring the policy was "minimal at best, and certainly not enough to sustain a live case or controversy." *Id.*; *see id.* at *18 ("To argue that a county attorney cannot bind future county attorneys to his non-prosecution policy is unremarkable and unpersuasive. Of course a future county attorney could change the UCAO Policy, but that possibility does not breathe life into an otherwise moot case."). Under the new policy, the Browns faced no threat of prosecution and "[a]ny prospective relief the district court might have awarded . . . would therefore have virtually no effect in the real world." *Id.* at *14 (internal quotation marks and citation omitted).

The Tenth Circuit noted that if the County Attorney "had announced only that his office had decided not to prosecute the Browns, the question of mootness would be closer." *Id.* at *15. But, because he also had adopted a formal policy that prevented future prosecution of the Browns and others similarly situated, and the decision not to prosecute was conferred in a declaration signed under penalty of perjury, the Browns faced "no credible threat of prosecution"

mooting the case.  *Id.*  The court also found that the Browns' relocation to Nevada in 2011 and

their intention not to return to Utah supported a finding that they faced no credible threat of

prosecution rendering the case moot.  *Id.*  Indeed, Utah's statute of limitations to prosecute the

Browns was four years, and they had not lived in Utah for more than five years.  *Id.* at *16.

In sum, the Circuit rejected each of the Browns' arguments against mootness and held

that the County Attorney's formal policy "eliminated any credible threat that the Browns [would]

be prosecuted" and so, the case became moot when the policy was announced.  *Id.* at *16–22.

The court of appeals remanded the case with instructions for the district court to vacate its

declaration and dismiss the suit without prejudice.  *Id.* at *22.

While *Brown* warranted a fresh examination of the mootness issue, the court concludes

that it does not require a different conclusion than the one reached in the August 10 Order.  The

facts here differ substantially from the facts of *Brown*.  In *Brown*, even before a formal office

policy existed, no one from the County Attorney's Office could recall ever prosecuting anyone

for bigamy unless other crimes also were committed.  *See* 2016 WL 2848510, at *4.  But here,

defendants began issuing marriage licenses and recognizing same-sex marriages on equal terms

only after the court issued a preliminary injunction requiring them to do so.  As the August 10

Order pointed out, "the Administrative Orders issued by the Chief Judges of Kansas' Seventh

and Eighteenth Judicial districts . . . state explicitly that the Chief Judges issued these orders to

comply with [the] Court's preliminary injunction."  Doc. 126 at 22–23.  While the Browns'

complaint sought a preliminary injunction enjoining enforcement of the bigamy statute, no

preliminary injunction motion was ever filed or granted.[9]  The County Attorney's voluntary

compliance thus was not produced by an injunction, but, instead, followed the office's informal

---

[9] The court draws this conclusion from the CM/ECF docket for *Brown*.

14

policy—later formally adopted—not to prosecute for bigamy unless the individual also committed other crimes.

In this case, the court determined that defendants had not shown that the allegedly wrongful behavior could not reasonably be expected to recur, the same standard the Tenth Circuit used in *Brown*. *Id.* at 23–29; *Brown*, 2016 WL 2848510, at *18 ("For voluntary cessation to moot a case, we must be convinced that the allegedly wrongful behavior could not *reasonably* be expected to recur, not that there is no possibility of future enforcement." (internal quotation marks and citation omitted)). The court explicitly considered defendants' arguments that they would comply voluntarily. Doc. 126 at 23–29. And the court conducted the factual inquiry *Brown* contemplates to assess whether defendants might recommence the challenged conduct.[10] Doc. 126 at 23–29; *Brown*, 2016 WL 2848510, at *12. Unlike *Brown*, the court concluded that a risk of future noncompliance existed because defendants presented no evidence establishing that they would continue to grant plaintiffs' requested relief for reasons independent of the preliminary injunction order. Doc. 126 at 23–29. The court also noted specific episodes of reluctance to comply with, or uncertainty about compliance with the mandate for equal treatment of same-sex spouses that had occurred after *Obergefell*. Doc. 126 at 23–29; *see Brown*, 2016 WL 2848510, at *11.[11] And the court found that a present determination of the issues would have effect in the real world because a declaratory judgment would affect defendants' conduct toward plaintiffs. Doc. 126 at 32–33; *see Brown*, 2016 WL 2848510, at *10–14 (reciting the same legal standard, but concluding that any relief the court might have awarded would have virtually no effect in the real world). The court thus determined that it should grant plaintiffs'

---

[10] The court need not repeat its detailed factual findings and reasoning here, and directs defendants to its August 10 Order. *See* Doc. 126 at 21–30.

[11] Some uncertainty still appears to exist today, as discussed more fully in the court's prudential mootness analysis, below.

claims for declaratory relief, holding that neither constitutional mootness nor prudential

mootness mooted plaintiffs' claims for declaratory relief.  Doc. 126 at 32–33.

Though defendants here assert generally that *Brown* requires the court to vacate its prior

judgment and dismiss this case as moot, nothing in *Brown* warrants either outcome.  Indeed, the

court already applied the same mootness standards recognized in *Brown*.  The only difference is

that these considerations led the court to conclude that a live controversy existed and that

defendants had not established the truly "voluntary cessation" of conduct necessary to make the

case moot.  While defendants here have made some remedial assurances, defendants' conduct

still suggested that plaintiffs and other same-sex spouses faced a credible threat of unequal

treatment.  The court's August 10 Order holding that the case was not constitutionally moot and

entering the requested declaratory judgment stands.

Though this leaves one unanswered question —should the court grant permanent injunctive relief

to enforce its declaratory judgment?  The court now turns to that issue.

### III.    SUMMARY OF THE COURT'S PERMANENT INJUNCTION RULING

After deciding constitutional mootness, the August 10 Order proceeded to consider

prudential mootness.[12]  *See* Doc. 126 at 29–30.  As that Order explained, the prudential mootness

doctrine counsels courts to exercise caution even when they have the power to grant permanent

injunctive relief.  *Id.* at 30–31.  The court noted that though defendants had taken steps to comply

with *Obergefell*, some facts still raised concerns.  Doc. 126 at 2.  And it thus gave the defendants

an opportunity to assemble a showing that they could, and would comply with *Obergefell*

voluntarily.  *Id.* at 3.  The defendants have since supplemented the record with additional

evidence of voluntary compliance.  Evaluating the various considerations recognized by the

---

[12] *Brown* stopped short of addressing prudential mootness because the court concluded the Browns' claim
was constitutionally moot, eliminating the court's jurisdiction.  *See Brown*, 2016 WL 2848510, at *10
n.15.

prudential mootness doctrine, the court has considered the facts established by the parties' post-August 10 submissions.  It also has examined decisions by other federal courts confronted with the same decision.

Exercising its remedial discretion, the court has decided to grant a permanent injunction forbidding defendants (and their successors) from enforcing or applying any aspect of Kansas law that treats same-sex married couples differently than opposite-sex married couples.  As the court noted last August, a significant value exists in giving public officials a reasonable opportunity to comply voluntarily with a mandate by the Supreme Court.  The record here shows that defendants have said they will comply with *Obergefell* and, in many instances, they have acted to implement the changes that compliance requires.  But even after *Obergefell* and even after this court's declaratory judgment, the record also demonstrates that one defendant's department deliberately refused to treat two same-sex married couples in the same fashion it routinely treats opposite-sex couples.  This disparate treatment did not result from oversight, inadvertence, or decisions made at lower levels of the department.  To the contrary, the conduct involved officials who the court would expect to know about *Obergefell*, this court's preliminary injunction, and defendants' assurances that they intended to comply with *Obergefell*.  This conduct required one same-sex couple to file an action in state court to get something that an opposite-sex couple would have received as a matter of course.

These undisputed facts and other factors, discussed fully below, push the court over the line that the prudential mootness doctrine asks courts to respect.  The language at the end of this order specifically describes the permanent injunction that the court enters against defendants.

## IV.    PRUDENTIAL MOOTNESS ANALYSIS

Defendants' position is that a permanent injunction is unnecessary because they have pledged to comply with *Obergefell* voluntarily.  Plaintiffs, on the other hand, remain concerned that defendants will not comply with *Obergefell*'s mandate without this court's involvement.

### A.  THE COURT WILL CONSIDER PLAINTIFFS' SUBMISSIONS OVER DEFENDANTS' OBJECTIONS.

First, the court briefly will address defendants' many objections to plaintiffs' submissions.

### 1.  TIMELINESS

In defendants' Objection and Response (Doc. 132), defendants complain that plaintiffs made their submissions in an untimely fashion.  Plaintiffs, however, view their submissions as a timely response to defendants' submissions asserting that defendants are fully recognizing same-sex marriages on equal terms as opposite-sex marriages.  While plaintiffs' submissions do not respond directly to defendants' submitted materials, the court is not persuaded by defendants' technical objection.  It will consider plaintiffs' submissions in the interest of making a fully informed decision about the final question remaining in this case.

### 2.  SUBJECT MATTER JURISDICTION

Defendants also claim that plaintiffs' submissions exceed the scope of the court's August 10 Order.  Specifically, defendants argue that the court lacks subject matter jurisdiction to consider the submissions because only non-parties are affected by the KDHE's refusal to list same-sex spouses as parents on birth certificates of children born through artificial insemination to same-sex married couples.  Defendants argue that the "potential legal issue [in the affidavits] does not relate to any of the plaintiffs . . . or . . . issues raised in this lawsuit [and] has no bearing on the request for permanent injunctive relief."  Doc. 132 at 3.  Defendants also assert that this

litigation involves only marriage licenses, drivers' licenses, state tax returns, and state employee health insurance. And they argue that "[p]laintiffs have submitted no evidence of a continuing or threatened violation of their own rights." *Id.* at 2. Thus, defendants say, plaintiffs have provided no evidence showing a need for permanent injunctive relief in this case.

The court disagrees. The August 10 Order stayed the court's hand on the permanent injunction decision because the Kansas officials sued in this case said they would comply with *Obergefell*. In effect, they "step[ped] in to promise the relief" that plaintiffs seek. *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012). As the Tenth Circuit has explained, though, the weight properly given to such an assurance depends on "who is making the promise and the reliability of that party's past promises." *Id.* at 1211. The court invited additional submissions because so little time had passed since the Supreme Court decided *Obergefell* and so little information was available about the reliability of defendants' assurances. The additional submissions, the court hoped, would inform the court's reliability evaluation.

Nor was the invitation for additional submissions as limited as defendants construe it. The August 10 Order, consistent with *Obergefell*'s holding, declared unconstitutional every "Kansas statute law, policy, or practice that prohibits . . . recognizing [same-sex] marriages on the same terms and conditions that apply to opposite-sex couples . . . ." Doc. 126 at 41; *see Obergefell*, 135 S. Ct. at 2605 (holding challenged state laws "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples"); *see also* Doc. 52 at 29–30 (plaintiffs' Amended Complaint requesting a declaration that "any . . . sources of state law that exclude same-sex couples from marrying and that prohibit recognition of same sex marriages" are unconstitutional and a permanent injunction against enforcement of such laws). Given the expansive scope of plaintiffs' claims and *Obergefell*'s

rule, this case is not confined merely to marriage licenses, drivers' licenses, state tax returns, and state health insurance.  And it is not confined—as defendants argue—merely to "evidence of a continuing or threated violation of [plaintiff's] own rights."  Doc. 132 at 2 (Defendants' Objection and Response to Plaintiffs' Additional Submissions).  The court finds that plaintiffs' submissions provide meaningful information about the reliability of defendants' remedial assurances.  They inform the prudential mootness analysis.

### 3.  MOOTNESS

Finally, defendants contend that the dispute described in plaintiffs' submissions—the KDHE's initial intransigence about including same-sex spouses on birth certificates for children born to same-sex married couples—is moot because the KDHE has issued the requested birth certificates.  Defendants also promise that "[n]o recurrence of the birth certificate dispute will occur by reason of any KDHE practice or policy because the relevant forms have been amended to invite applications by same-sex parents."  Doc. 132 at 3.  They thus contend that the court should ignore plaintiffs' submitted declarations.

Again, the court disagrees.  Defendants' Response asserts that the KDHE now is voluntarily issuing birth certificates to same-sex parents, and has done so for the couples who submitted declarations.  Defendants provide an affidavit from Eugene Lueger, the Associate Chief Counsel of the KDHE Division of Public Health.  Mr. Lueger states that "[t]he requested birth certificates have been filed with the [KDHE]" and "[a]ll future requests for the filing and issuance of birth certificates involving a biological mother reporting that she is married, whether the spouse is male or female, will similarly result in the biological mother's spouse being named as the second parent on the birth certificate."  Doc 132-5 at 2.  He confirms that new forms have

been prepared to accommodate same-sex parents. *Id.*; *see also* Doc. 132-3 (showing a new birth certificate form with a "Father/Parent II option").

But, while Mr. Lueger represented to this court on October 9, 2015, that the KDHE has changed its policies and procedures to accommodate same-sex spouses going forward, the KDHE has not carried its burden to show that this change was implemented as broadly as it promised. Mr. Lueger avers that "[n]ew forms have been prepared," but the facts before the court create uncertainty whether the KDHE will treat all same-sex spouses who give birth through artificial insemination the same as it treats opposite-sex spouses.

Plaintiffs have provided a declaration from David Brown, the attorney representing the Smiths. Mr. Brown's declaration asserts that on October 8, 2015, the KDHE Deputy General Counsel, Timothy Keck, stated that the KDHE would consider same-sex spouses' applications for birth certificates "*on an individual basis*." Doc. 133-1 at 2–3 (emphasis added). And, while the KDHE asserted the next day through Mr. Lueger that "the requested birth certificates have been filed" and "[a]ll future requests . . . will result in the biological mother's spouse being named . . . on the birth certificate[,]" the KDHE never addressed Mr. Keck's contrary position, *i.e.*, that same-sex married couples "will need [to] contact the KDHE and make the Office of Vital Statistics aware of their circumstances so that the KDHE can consider each application on an individual basis." Docs. 132-5 at 2; 133-1 at 2–3. Likewise, defendants have provided no assurances that the software used at hospitals to generate birth certificates has been updated to accommodate same-sex spouses so that they no longer have to take an additional step not required of opposite-sex spouses when applying for birth certificates, *i.e.*, that they no longer have to contact the KDHE Office of Vital Statistics to procure amended birth certificates listing

the non-biological spouse as a parent.  *See* Doc. 126 at 29 (noting that "the mootness standard

requires precise and certain assurances").

Finally, as explained in more detail below, the court has concerns that the KDHE would

have made the policy changes it since has reported if the dispute had not been brought to this

court's attention.  The court cannot conclude that the behavior that contradicted defendants'

remedial assurances will not recur.  Thus the dispute is not moot.  *See* Doc. 126 at 23–24

(discussing the stringent standard for mootness by voluntary compliance).  For this reason and

those discussed below, the court concludes that permanent injunctive relief is warranted.

### B.  THE MAJORITY OF OTHER FEDERAL DISTRICT COURTS HAVE GRANTED RELIEF THAT INCLUDES A PERMANENT INJUNCTION.

Before the Supreme Court directly decided the constitutional question presented by same-

sex marriage bans, permanent injunctions prohibiting such bans were common.  *See, e.g.*, *Latta*

*v. Otter*, 771 F.3d 456, 476–77 (9th Cir. 2014) (affirming district court's declaration that Idaho's

laws banning same-sex marriage were unconstitutional and issuance of a permanent injunction

against the enforcement of such laws); *Bostic v. Schaefer*, 760 F.3d 352, 384 (4th Cir. 2014)

(upholding district court's decision enjoining enforcement of Virginia laws preventing same-sex

couples from marrying); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) (affirming district

court's permanent injunction banning enforcement of Utah's same-sex marriage prohibition, but

staying the injunction "pending the disposition of any subsequently filed petition for writ of

certiorari").

Once *Obergefell* held that state laws banning same-sex marriage violate the

Constitution's due process and equal protection clauses, a majority of courts have continued to

issue permanent injunctive relief (in addition to declaratory relief).  *See, e.g.*, *Strawser v.*

*Strange*, No. 14-0424-CG-C, 2016 WL 3199523, at *3 (S.D. Ala. June 7, 2016) (concluding the

case was not moot after *Obergefell* and issuing a permanent injunction preventing enforcement of Alabama's marriage laws prohibiting same-sex marriage); *Brenner v. Scott*, Nos. 4:14cv107-RH/CAS, 4:14cv138-RH/CAS, 2016 WL 3561754, at *3–4 (N.D. Fla. Mar. 30, 2016) (holding the case was not moot after *Obergefell* and permanently enjoining the Secretary of the Florida Department of Management Services and the Florida Surgeon General from enforcing Florida's laws banning same-sex marriage); *Waters v. Ricketts*, ___ F. Supp. 3d ___, No. 8:14CV356, 2016 WL 447837, at *6 (D. Neb. Feb. 4, 2016) (permanently enjoining Nebraska's same-sex marriage ban and ordering all relevant state officials to "treat same-sex couples the same as different-sex couples in the context of processing marriage licenses or determining the rights, protections, obligations or benefits of marriage"); *Jernigan v. Crane*, No. 4:13-cv-00410 KGB, 2015 WL 9265540, at *1 (E.D. Ark. Sept. 14, 2015) (lifting stay of permanent injunction after Eighth Circuit, 796 F.3d 976, 980 (8th Cir. 2015), affirmed district court's decision and found that assurances of compliance with *Obergefell* did not moot the case, but might influence the need for continued injunctive relief); *Rosenbrahn v. Daugaard*, No. 4:14-cv-04081-KES, slip. op. (D.S.D. Sept. 9, 2015) (lifting stay against permanent injunction enjoining defendants from enforcing any provision of state law refusing to recognize an existing marriage solely because it is a same-sex marriage after the Eighth Circuit, 799 F.3d 918, 922 (8th Cir. 2015), determined that assurances of compliance with *Obergefell* did not moot the case but might affect the necessity of continued injunctive relief); *Taylor v. Brasuell*, No. 1:14-cv-00273-REB, 2015 WL 4139470, at *7–8 (D. Idaho July 9, 2015) (declining to conclude that case was moot because defendant had not established with absolute clarity that the wrongful behavior would not reoccur and issuing limited permanent injunction enjoining defendants from "enforcing any constitutional provision, statute, regulation, or policy preventing qualified same-sex couples

from being buried or interred together at the Idaho State Veterans Cemetery which, if the spouses were not of the same sex, would be otherwise valid under the laws of the state"); *Robicheaux v. Caldwell*, Nos. 13-5090 C/W, 14-97, 14-327, 2015 WL 4090353, at *1–2 (E.D. La. July 2, 2015) (permanently enjoining defendants from enforcing Louisiana's constitutional provisions and laws banning same-sex marriage).

One court came to the opposite conclusion. It granted summary judgment for defendants because it determined that "*Obergefell* forecl[es] the possibility that South Carolina's same-sex marriage ban will be reinstated . . . and thus it is impossible for the court to grant any effectual relief." *Haas v. S.C. Dep't of Motor Vehicles*, No. 6:14-cv-04246-JMC, 2015 WL 4879268, at *2 (D.S.C. Aug. 13, 2015) (internal quotation marks omitted).

After evaluating these decisions and comparing them to the posture of the Kansas facts, the court has decided to follow the majority approach. It grants plaintiffs' request for permanent injunctive relief.

### C. DEFENDANTS' REMEDIAL COMMITMENTS ARE NOT SUFFICIENTLY RELIABLE TO NULLIFY THE NEED FOR A PERMANENT INJUNCTION.

Plaintiffs' submissions/responses show that the court's August 10 declaration notwithstanding, the KDHE initially refused to treat same-sex spouses equally when presented with birth certificate applications from two same-sex couples who had given birth through artificial insemination. Indeed, Mr. Brown's declaration confirms the extent of the KDHE's resistance.

When Ms. Falmer Smith gave birth to her child, the KDHE refused to recognize her wife as a parent on the birth certificate unless she completed a step-parent adoption. *See* Doc. 131–3 (Declaration of Ms. Falmer Smith). So, the Smiths hired Mr. Brown and they sought an

emergency order determining Ms. Jessica Smith's parentage from the Douglas County, Kansas

District Court.  And Judge Pokorny of that court determined that Ms. Jessica Smith is also the

child's parent under Kansas law.  But, "[d]espite Judge Pokorny's order, [the] KDHE [Office of

Vital Statistics] refused to issue a birth certificate listing both of [Mr. Brown's] clients as

parents.  KDHE Deputy General Counsel Timothy Keck specifically told [Mr. Brown] he wanted

an opportunity to appear before the [Douglas County District] Court to argue that both [of Mr.

Brown's] clients' names should not be on the birth certificate." Doc. 133-1 at 2.  This led Mr.

Brown to file a motion to join the KDHE in the state court case, and a hearing was scheduled for

November 6, 2015.

    In the interim, Ms. Falmer Smith filed her declaration in this case.  *See* Doc. 131-3.  Two

days later, Mr. Lueger informed Mr. Brown that the KDHE had decided to add Ms. Jessica Smith

to the birth certificate, obviating the need for further action in state court.  *See* Doc. 133-1 at 2.

Mr. Brown then inquired whether the KDHE was changing its policies and procedures to require

equal treatment for same-sex spouses who conceive through artificial insemination.  *See id.*  Mr.

Brown states that Mr. Keck "indicated that [the] KDHE was not changing its policies or

procedures" and that "same-sex married couples who conceive children through assistive

reproductive technology will need to contact the KDHE and make the Office of Vital Statistics

aware of their circumstances so that [the] KDHE can consider each application on an individual

basis." *Id.* at 2–3.  In contrast, Mr. Lueger's declaration asserts, "*All* future requests for the filing

and issuance of birth certificates involving a biological mother reporting that she is married,

whether the spouse is male or female, will . . . result in the biological mother's spouse being

named as the second parent on the birth certificate." Doc. 132-5 at 2 (emphasis added).

Given these contradictory positions within the KDHE, plaintiffs remain concerned whether defendants will comply voluntarily with *Obergefell* without the judicial oversight that an injunction permits. The court shares plaintiffs' concern. It appears that the KDHE refused to name Ms. Jessica Smith as a parent, that is, until plaintiffs brought this situation to this court's attention. The court also is concerned with the KDHE's initial refusal to treat same-sex married couples in the same fashion it routinely treats opposite-sex couples. And the court finds that permanent injunctive relief could prevent future same-sex married persons from having to do what the Smiths had to do—initiate a separate lawsuit and incur expenses to secure the equal treatment that *Obergefell* promises.

Defendants make several arguments designed to defend the KDHE's initial refusal to issue birth certificates to the same-sex married couples. For instance, defendants assert that the KDHE did not violate "anyone's legal rights by requesting that a judicial order be obtained before issuing [a] birth certificate." Doc. 132 at 3. This is a curious position because *Obergefell* held that it is unconstitutional for states to treat same-sex married couples differently than they treat opposite-sex married couples. Kansas law permits opposite-sex married couples to list both spouses as parents for children conceived through artificial insemination and born to such couples.[13] It does not require such couples to "obtain a judicial order." But defendants apparently believe that the Constitution still permits them to require same-sex couples to take this additional step. It does not.

Next, defendants argue that *Obergefell*'s holding was narrow. They contend that, because *Obergefell* did not specifically address "the legal parentage of infants allegedly born as the result of artificial insemination[,]" the Supreme Court's mandate is unrelated to the issues presented in plaintiffs' submissions. Doc. 132 at 4. They also assert that "paternity laws that

---

[13] *See* Kan. Stat. Ann. §§ 23–2208(f); 23–2302.

recognize the biological differences between men and women" may be constitutional.  Finally, and apparently in reference to Ms. Hunt and Ms. Gosner's Canadian marriage, defendants argue that *Obergefell* "says nothing about recognition of Canadian marriages."  Doc. 132 at 4; *see* Doc. 132-1 (Ms. Hunt and Ms. Gosner were married in Canada in 2007).  The court is not persuaded by these arguments.  With this Order, the court is not deciding whether all parentage laws treating same-sex female spouses differently because of biological dissimilarities are unconstitutional.  Nor is the court tasked with determining the validity of a Canadian marriage.  But, the court does consider the parties' positions to determine whether defendants are complying with *Obergefell* voluntarily, and thus—according to defendants—precluding the need for a permanent injunction.  And, as explained more below, defendants' arguments about the reach of *Obergefell*, Kansas parentage laws, and the recognition of a foreign same-sex marriage demonstrate at least continuing resistance to *Obergefell*'s broad mandate.

First, the court interprets *Obergefell*'s holding as a broad one.  Accordingly, the court's declaration in its August 10 Summary Judgment Order was broad.  It declared that "any . . . Kansas statute, law, policy, or practice that prohibits . . . recognizing such marriages on the same terms and conditions that apply to opposite-sex couples [is] . . . void and in contravention of the Fourteenth Amendment to the United States Constitution."  Doc. 126 at 41; s*ee also supra* Part IV.A.2 (addressing defendants' objections based on subject matter jurisdiction).

Second, *Obergefell* certainly recognized the importance of parental rights for same-sex couples.  The same-sex couple in the Michigan case had adopted three children, but Michigan law permitted only opposite-sex married couples or single individuals to adopt, so only one woman could have parental rights for each child.  *Obergefell*, 135 S. Ct. at 2595.  The Supreme Court described how, if an emergency occurred, or one of the spouses passed away, the other

spouse "would have no legal rights over the children she had not been permitted to adopt." *Id.*

Holding that same-sex couples are constitutionally entitled to civil marriage, the Supreme Court

found that one basis for protecting the right to marry

> is that it safeguards children and families and thus draws meaning from
> related rights of childrearing, procreation, and education. . . .   Marriage
> also affords the permanency and stability important to children's best
> interests. . . .   Without the recognition, stability, and predictability
> marriage offers, their children suffer the stigma of knowing their families
> are somehow lesser.   They also suffer the significant material costs of
> being raised by unmarried parents, relegated . . .  to a more difficult and
> uncertain family life.

*Id.* at 2600.  The Supreme Court found that the rights, benefits, and responsibilities of marital

status include "taxation; inheritance and property rights; . . .  spousal privilege . . . ; hospital

access; medical decisionmaking authority; adoption rights; the rights and benefits of survivors;

*birth and death certificates*; . . . health insurance; and child custody, support, and visitation

rules." *Id.* at 2601 (emphasis added).

Thus, while one state may confer different benefits on married couples than other states

do, *Obergefell* requires every state to treat same-sex married couples the same way it treats

opposite-sex married couples.  *See id.*  This includes the marital benefits of raising children

together, with the same certainty and stability given opposite-sex couples.  The court understands

that the KDHE now has issued the requested birth certificates and that one representative has

promised that the KDHE will treat all future requests from same-sex spouses on the same terms

as opposite-sex spouses.  *See* Doc. 132–5.  But, the record also establishes that the KDHE

initially refused to treat same-sex spouses on equal terms.  It also establishes that another KDHE

representative indicated the department was not changing its policies and would consider same-

sex applications on an individual basis.  This conduct raises doubts about the reliability of

defendants' remedial promises.  Thus, by permanently enjoining defendants from treating same-

sex married couples differently than they treat opposite-sex married couples in terms of the rights, protections, obligations, or benefits of marriage, the rights of same-sex spouses no longer are at risk of case-by-case treatment.

Defendants' last argument—that *Obergefell* says nothing about recognizing marriages performed in another country—is equally unpersuasive. This argument is puzzling because Kansas law itself provides that "[a]ll marriages . . . which would be valid by the laws of the country in which the same were contracted, shall be valid in all courts and places in this state." Kan. Stat. Ann. § 23-2508.[14] Again, *Obergefell* requires states to treat same-sex marriages on equal terms as opposite-sex marriages.

In sum, defendants' argument that *Obergefell*'s holding was narrow is unpersuasive. The court concludes that issuing a permanent injunction will ensure that defendants fully comply with *Obergefell*'s broad holding that state laws which "exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples" are invalid. *Obergefell*, 135 S. Ct. at 2605. Like the Supreme Court in *Obergefell*, the court finds that a "slower, case by-case determination of the required availability of specific public benefits to same sex couples . . . would deny gays and lesbians many rights and responsibilities intertwined with marriage." *Id.* at 2606. Perhaps defendants will provide the voluntary compliance with *Obergefell* that they promise. But the court cannot assign plaintiffs' constitutional rights to such uncertainty. In short, defendants' assurances of future compliance do not provide the reliability that those rights deserve.

---

[14] This court previously held that the remainder of that statute, which stated that "[i]t is the strong public policy of this state only to recognize as valid marriages from other states that are between a man and a woman[,]" is unconstitutional. *See* Doc. 126 at 43.

## V.   STANDARD FOR A PERMANENT INJUNCTION

"A party requesting a permanent injunction bears the burden of showing:  (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003) (citations omitted).  Here, plaintiffs have met their burden for permanent injunctive relief.

First, the court granted plaintiffs' request for declaratory relief and thus plaintiffs have prevailed on the merits.  Second, irreparable harm will exist unless the injunction is issued.  Defendants argue that "[n]one of the plaintiffs offers a reason for this court to conclude that any of them would suffer harm if this court fails to issue a mandatory injunction."  Doc. 132 at 4.  But, as explained above, plaintiffs' submissions about the treatment of same-sex spouses on birth certificates show that some defendants continued to resist *Obergefell*'s broad mandate.  *See Brown*, 2016 WL 2848510, at *11 (noting that defendants carry a "formidable burden" of showing that the "allegedly wrongful behavior could not reasonably be expected to recur").  While defendants have complied voluntarily in several important respects, the KDHE initially refused to treat two same-sex married couples the same as it treats opposite-sex married couples until the dispute was brought to this court's attention.  Defendants also have asserted arguments which indicate that future disputes over the rights, protections, obligations, or benefits of marriage are possible.  Plaintiffs and other same-sex spouses, therefore, are at risk of additional constitutional deprivations without injunctive relief.  The court concludes that irreparable harm exists.  Third, the threatened injury to same-sex spouses outweighs the harm that the injunction may cause defendants.  Defendants have not demonstrated that a permanent injunction will harm

them—particularly because they plan to comply with *Obergefell* without an injunction.  Finally, the injunction will not adversely affect the public interest.  "'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'"  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (plurality) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

## VI.   CONCLUSION

As explained above, the record establishes that defendants have taken many commendable steps to comply with the rule of constitutional law that *Obergefell* established.  But, these actions fail to make the showing of reliability that the prudential mootness doctrine requires.  Permanent injunctive relief still is warranted.

Defendants are permanently enjoined from enforcing any portion of the Kansas Constitution, any Kansas statute, and any other Kansas law, policy, or practice that prohibits issuing marriage licenses to same-sex couples in Kansas.  This prohibition includes but is not limited to Article 15, § 16 of the Kansas Constitution, Kan. Stat. Ann. § 23-2501, and Kan. Stat. Ann. § 23-2508.  In addition, the court's permanent injunction forbids defendants (and their successors) from treating same-sex married couples differently than they treat opposite-sex couples in the context of processing marriage licenses or determining the other rights, protections, obligations, or benefits of marriage.

The court retains jurisdiction over the enforcement of this permanent injunction and issues related to it for three years.[15]  If any party believes a modification of this timeline is merited, it may file an appropriate motion with the court.

---

[15] *See Waters v. Ricketts*, __ F. Supp. 3d ___, No. 8:14CV356, 2016 WL 447837, at *6 (D. Neb. Feb. 4, 2016) (imposing a similar three-year retention of jurisdiction to enforce a permanent injunction in a same-sex marriage case)

With this Order the court has ruled on all aspects of plaintiff's Motion for Summary Judgment (Doc. 85). This leaves only the Amended Complaint's claim for an award of attorneys' fees. *See* Doc. 52 at 30 (Amended Complaint, seeking declaratory relief, injunctive relief, and an award of costs, expenses, and reasonable attorneys' fees under 42 U.S.C. § 1988). If plaintiffs' elect to pursue this claim, they must file a timely motion. *See* D. Kan. Rule 54.2. Plaintiffs are ordered to file any motion for attorneys' fees they plan to file within thirty (30) days of the date of this Order. If the parties are unable to agree on fees under the procedure adopted by our local rule, defendants may file a response within fourteen (14) days of the required memorandum in support of plaintiffs' motion. And plaintiffs may file a reply within seven (7) days of such a response.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Summary Judgment (Doc. 85) seeking permanent injunctive relief is granted. The court previously granted this Motion in part by its previous Order (Doc. 126).

**IT IS FURTHER ORDERED THAT** defendants are permanently enjoined from enforcing any portion of the Kansas Constitution, any Kansas statute, and any other Kansas law, policy, or practice that prohibits issuing marriage licenses to same-sex couples in Kansas. This prohibition includes but is not limited to Article 15, § 16 of the Kansas Constitution, Kan. Stat. Ann. § 23-2501, and Kan. Stat. Ann. § 23-2508.

**IT IS FURTHER ORDERED THAT** defendants (and their successors) are permanently enjoined from treating same-sex married couples differently than they treat opposite-sex married couples in the context of processing marriage licenses or determining the other rights, protections, obligations, or benefits of marriage.

**IT IS FURTHER ORDERED THAT** the court retains jurisdiction over the enforcement of the permanent injunction and issues related to it for three years.

**IT IS FURTHER ORDERED THAT** plaintiffs shall file any bill of costs and any motion for attorneys' fees within thirty (30) days of the date of this Order.

**THE COURT DIRECTS THE CLERK** to enter judgment since this Order resolves all merits questions and leaves only the question of attorneys' fees, if plaintiffs elect to make such a claim.[16]

**IT IS SO ORDERED.**

**Dated this 22nd day of July, 2016, at Topeka, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**

---

[16] *See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. City of Pittsburg, Kan.*, 987 F.2d 1516, 1518 (10th Cir. 1993) (citing *Cox v. Flood*, 683 F.2d 330, 331 (10th Cir. 1982)).